# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-064**

**Filing Date: September 9, 2021**

**No. A-1-CA-38225**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ALBERT DELL SHELBY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Karen L. Townsend, District Judge**

Certiorari Denied, November 3, 2021, No. S-1-SC-39039. Released for Publication December 14, 2021.

Hector H. Balderas, Attorney General
Santa Fe, NM
Lauren Joseph Wolongevicz, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**BOGARDUS, Judge.**

**{1}** Defendant appeals from the district court's judgment and sentence convicting him of burglary of a dwelling, pursuant to NMSA 1978, Section 30-16-3(A) (1971); larceny over $2,500, pursuant to NMSA 1978, Section 30-16-1(E) (2006); and criminal damage to property over $1,000, pursuant to NMSA 1978, Section 30-15-1 (1963). On appeal, Defendant contends that his conviction for burglary of a dwelling is not supported by sufficient evidence because the interior of the house at issue was under

construction, it lacked electricity and running water, and the evidence did not show that the owner "customarily used" the house "as living quarters" as required by the jury instruction, UJI 14-1631 NMRA, defining "dwelling house." Considering the physical characteristics of the house, its use, and its purpose under the specific facts of this case and in light of the interests protected by the statute, we hold that, on balance, the evidence was sufficient to support Defendant's conviction for burglary of a dwelling house. Accordingly, we affirm.

**BACKGROUND**

**{2}**     The burglary at issue here was discovered after a UPS driver attempted to deliver a package at the house in question. When the driver arrived, he noticed that the screen doors were open on the front porch, and the homeowner was nowhere to be found. The driver decided to return the following day to get the signature he needed for delivery. On his return, the driver saw that everything appeared the same with the doors still wide open and, again, no one home. He became suspicious and called the sheriff's department. The police called the homeowner (Victim) and dispatched officers to the property. Victim called his friend, who watched the property, and asked him to look around the property with the officers. At the house, the friend and police found window screens placed on the ground, scratch marks on the front outer door and the back French doors as though someone tried to "jimmy into them," and a window with a broken lock that looked as if it had been pried open. Inside the house, numerous homebuilding tools were missing. The friend explained that Victim was still building the house and that he would stay in the house and work on it even though it lacked power or running water. The friend watched the house while Victim worked out of town, which he thought was often, perhaps every other week. Victim worked for twenty years as an independent drilling consultant and was working in an oilfield in Texas on the day of the incident, February 14, 2018. Victim left to work in Texas on February 6, 2018, and could not return to the house until he left Texas on February 20, 2018. The last time Victim's friend checked on the house was a day or two before the break-in, and everything appeared normal. After the break-in, pursuant to Victim's request, his friend resecured the window, relocked the house, and used his own locks for the sheds in order to resecure the house until Victim could return.

**{3}**     Victim testified that three months before the break-in, he ran out of money necessary to complete the house. He testified that the outside of the house was complete, and he was working on his days off to finish the interior himself, as time permitted. He testified that he lived and stayed at the house in the small part of it he had made "somewhat livable." Victim identified the address of the house as the place where he lives and explained that he kept a cot, a barbeque grill, and liquor at the house. He also kept a camper with a TV at the house and a 3000-watt generator. To further protect his property, in addition to the locks on the doors and windows, Victim had set up a game camera on the camper pointing toward the front end of the house with the driveway and the door, which captured images that led to Defendant's arrest. Victim testified that he did not know Defendant and did not give him permission to enter his house. Victim further testified that in total he suffered $6,500 in damage to the house, a

loss of about $18,000 from the tools and liquor bottles stolen from the inside of the house, and a loss of about $3,100 from the generator and the TV taken from his camper.

**DISCUSSION**

**{4}** Defendant's claim of error—that there was insufficient evidence to establish that the burglary site was a dwelling—requires us to address for the first time in New Mexico relevant factors to consider to determine whether a structure is a "dwelling house" pursuant to the burglary statute. When assessing the sufficiency of the evidence, "we view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Samora*, 2016-NMSC-031, ¶ 34, 387 P.3d 230 (internal quotation marks and citation omitted). We disregard all evidence and inferences that support a different result. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "We then determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (internal quotation marks and citation omitted). "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883.

**{5}** Defendant's argument also requires us to construe the pertinent section of New Mexico's burglary statute, Section 30-16-3(A). "Our primary goal when interpreting statutory language is to give effect to the intent of the [L]egislature." *State v. Torres*, 2006-NMCA-106, ¶ 8, 140 N.M. 230, 141 P.3d 1284. "We do this by giving effect to the plain meaning of the words of [the] statute," *State v. Marshall*, 2004-NMCA-104, ¶ 7, 136 N.M. 240, 96 P.3d 801, except when doing so "render[s] the statute's application absurd, unreasonable, or unjust[.]" *State v. Rowell*, 1995-NMSC-079, ¶ 8, 121 N.M. 111, 908 P.2d 1379 (internal quotation marks and citation omitted).

**{6}** The jury here was instructed in relevant part that the charge of burglary required the State to prove beyond a reasonable doubt that Defendant entered a "dwelling" at the address described "without authorization" and "with the intent to commit a theft or residential burglary when he got inside[.]" This instruction is consistent with the burglary statute, which defines burglary as "the unauthorized entry of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, with the intent to commit any felony or theft therein." Section 30-16-3. New Mexico's burglary statute distinguishes the unauthorized entry into a "dwelling house" as a higher degree of felony than the unauthorized entry into other structures. *Compare* § 30-16-3(A) ("Any person who, without authorization, enters a dwelling house with intent to commit any felony or theft therein is guilty of a third degree felony."), *with* § 30-16-3(B) ("Any person who, without authorization, enters any vehicle, watercraft, aircraft or other structure, movable or immovable, with intent to commit any felony or theft therein is guilty of a fourth degree felony."). The Legislature has not provided a statutory definition of "dwelling house."

**{7}** The jury instructions given in this case define "dwelling house" as "any structure, any part of which is customarily used as living quarters[,]" consistent with the definition in the applicable uniform jury instruction. *See* UJI 14-1631 ("A 'dwelling house' is any structure, any part of which is customarily used as living quarters."). There is no New Mexico case law addressing what factors or considerations the language defining "dwelling house" might entail. Indeed, based on our own review, this definition does not appear in any of our statutes or in the law of other jurisdictions outside of its use in UJI 14-1631. Because there are innumerable combinations of circumstances and living arrangements that may be presented to our courts, we do not attempt to circumscribe all the considerations that may be involved in determining whether a structure is "customarily used as living quarters." *See State v. Office of Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶ 59, 285 P.3d 622 (noting that defining the entries prohibited by the burglary statute is elusive and is bound to "include entries not intended by the Legislature and vice-versa[,]" given that there are countless scenarios that may arise). Rather, we assess whether the evidence presented in this case established a dwelling house, as intended by the Legislature, in light of the language of the statute and uniform jury instruction, the purpose and policies underlying the New Mexico burglary statute, and the sparse New Mexico case law that applies the residential burglary statute to specific factual circumstances. *See id.* ¶¶ 31, 34, 39-48 (construing legislative intent to punish the conduct at issue by using the language of the burglary statute, rules of statutory construction, the policy and interests underlying the New Mexico burglary statute, and this Court's application of the statute). We do not rely directly on out-of-state case law in this opinion because other states take different approaches to defining "burglary" and "dwellings," and there is no consensus on matters presented by the facts of this case. *See id.* ¶¶ 27-28 (cautioning against using jurisprudence of other states when applying our burglary statute due to the differences in the language used in other burglary statutes and the purposes served by other states' statutes); *see also, e.g.*, Annotation, *Occupant's Absence From Residential Structure as Affecting Nature of Offense as Burglary or Breaking and Entering*, 20 A.L.R. 4th 349, §§ 2-19 (1983) (providing that states take different approaches to determining the existence of a dwelling when faced with questions under their own burglary statutes concerning, among other things, the uses of a residence, frequency of use of a residence, the presence of belongings, the relevance of intent for use as a residence, and the availability of utilities).

## I.     Defining Burglary of a Dwelling House

**{8}** The plain language and structure of the New Mexico burglary statute makes clear that the Legislature separated the unauthorized entry into a dwelling house from the unauthorized entry into all other structures as a more serious crime subject to greater punishment. *Compare* § 30-16-3(A), *with* § 30-16-3(B). Our Supreme Court recounted that a dwelling house was the original structure that common law burglary and its codification sought to protect. *Muqqddin*, 2012-NMSC-029, ¶¶ 15-16, 19. It explained that "the original common-law purpose of burglary, the protection of the security of habitation or a similar space, is still relevant when construing our modern burglary statute." *Id.* ¶ 39. In *Muqqddin*, our Supreme Court instructed us to be circumspect in

our application of the burglary statute to various structures and parts thereof, and, instead of conducting a simple application of the plain meaning rule to merely protect property, we should consider the harm caused by the entry and its relatedness to the security of habitation. *Id.* ¶¶ 36-39. Our Supreme Court rejected this Court's over-inclusive construction of the burglary statute's reference to "vehicle" to include the defendant's piercing of the gas tank beneath a van with the intent to siphon gas. *Id.* ¶¶ 5, 43. The purpose of burglary, our Supreme Court explained, was and continues to be founded on a policy "to punish the forcible invasion of a habitation and violation of the heightened expectation of privacy and possessory rights of individuals in certain structures[.]" *Id.* ¶ 16 (alteration, internal quotation marks, and citation omitted). Among the possessory rights protected by the burglary statute are the right to control property and exclude others. *Id.* ¶¶ 41-42. Among the privacy interests protected by the burglary statute is the security of habitation and personal space, which require an enclosure. *Id.* ¶¶ 42-44; *see id.* ¶ 43 (explaining that the privacy interest of our modern burglary statute and the common law security of habitation "[b]oth aim to protect against the feeling of violation and vulnerability that occurs when a burglar invades one's personal space"). "It is the nature of the enclosure that creates the expectation of privacy. Enclosure puts the public on notice." *Id.* ¶ 45; *see also State v. Mestas*, 2016-NMCA-047, ¶ 27, 370 P.3d 805 (explaining that under *Muqqddin*, we must examine the physical characteristics of an area to determine whether the space is private, enclosed, or sealed-off from public entry and protected by the burglary statute). Thus, in order to benefit from the highest burglary protections, there must be an unauthorized entry into a structure that is a dwelling house, physically defined by an enclosed space, and in which there are the heightened privacy and possessory interests of habitation. *Muqqddin*, 2012-NMSC-029, ¶¶ 39-45; *see also id.* ¶ 3 (explaining that the crime of burglary is focused on punishing a "harmful entry," and residential burglary is aimed at the security of habitation and protecting occupants against the "terror and violence" that result from a home invasion).

**{9}** The "dwelling house" protected by Section 30-16-3(A) is defined as "any structure, any part of which is customarily used as living quarters." UJI 14-1631. Our Supreme Court has not explained whether the UJI requires proof that the type of structure entered is customarily used for living quarters or whether the UJI is more concerned with the actual use or purpose of a structure. "To ascertain the common-sense meaning of the terms" used in the jury instruction, we commonly turn to the dictionary for guidance. *State v. Stephenson*, 2017-NMSC-002, ¶ 16, 389 P.3d 272. "Customarily" is defined as "by or according to custom or established practice[, or] . . . in accordance with what is customary or usual." *See Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/customarily (last visited Sept. 7, 2021). *Black's Law Dictionary* defines "customary" as "[a]ccording to custom or usage; founded on, or growing out of, or dependent on, a custom." The Law Dictionary, *Featuring Black's Law Dictionary Free Online Legal Dictionary 2nd Ed.*, https://thelawdictionary.org/customary (last visited Sept. 7, 2021). Thus, "customarily used" has two chief meanings, one referring to an expected, typical use of a structure and the other referring to an actual, established use of a structure.

**{10}** The focus of our Supreme Court's analysis in *Muqqddin* was on the possessory and privacy interests the burglary statute seeks to protect, 2012-NMSC-029, ¶¶ 39-43, and the Court's discussion of both the physical characteristics of the structure and the use of a structure entered shows these are interrelated considerations when identifying the interest protected and the type of entry the Legislature seeks to deter. *Id.* ¶¶ 41-45. In light of the double meaning of "customarily used" referring to both typical and actual use, and our Supreme Court's discussion of the physical characteristics and interests in a structure, we believe the type, nature, use, and purpose of a structure entered are all relevant to our determination of the interests invaded and whether there was an unauthorized entry into a dwelling house "customarily used for living quarters." *See* Jeffrey F. Ghent, Annotation, *What Is "Building" or "House" Within Burglary or Breaking and Entering Statute*, 68 A.L.R. 4th 425, § 2 (1989) ("Apart from the statutory language and legislative intent, the courts have tended to weigh all of the facts concerning the nature, purpose, use, size, composition, and condition of each particular structure in determining whether it is a 'building' or 'house[.]' "). Lastly in construing UJI 14-1631, we understand its use of the terms "living quarters" to mean human habitation, given that the burglary statute is founded on an interest in the security of habitation. *See Muqqddin*, 2012-NMSC-029, ¶¶ 16, 39, 43.

**{11}** Taking these considerations together, we consider the evidence presented in this case regarding the physical characteristics of the structure to determine whether it is a type of structure customarily used for living quarters and in which possessory and privacy interests of habitation should be protected. We also examine whether the structure was actually used for living quarters, whether its purpose was for habitation, and whether its use as living quarters was sufficient to warrant protection of the heightened privacy and possessory interests of habitation. Although we separate these factors under distinct headings, we recognize that they are related considerations that involve overlapping concepts.

## A.    Type of Structure

**{12}** Applying these factors to the evidence in the current case, we first note there was sufficient evidence of an unauthorized entry into an enclosed structure. The nature of the structure was that of a house with a screened-in porch, enclosed with a roof, walls, doors, windows, and locks. Although not necessarily required of a "dwelling house," these characteristics supply ample evidence of an enclosure and the exercise of possessory and privacy rights that would put the public on notice of a private space. *See Muqqddin*, 2012-NMSC-029, ¶ 45. Also not necessarily required of a "dwelling house," pictures of the house and the testimony provided show that the structure at issue appears to be a residence and had an address, a fence, sheds, and a camper parked on the property. Thus, it is a type of structure that is typically used for human habitation. *Cf. State v. Ross*, 1983-NMCA-065, ¶ 11, 100 N.M. 48, 665 P.2d 310 (holding that a detached, non-contiguous garage did not constitute a "dwelling house" or any part thereof within the meaning of UJI 14-1631, noting also that the garage was not used for living quarters).

**B.      Use as Living Quarters**

**{13}**    The State also presented evidence that Victim used the house as his living quarters. He occupied the house and stayed there; he kept tools in the house and worked to complete the interior of the house; he kept a cot in the area of the house he considered "somewhat livable" and slept there; he kept a barbeque grill at the house so that he could eat there; he kept bottles of liquor at the house, suggesting he also used the house for leisure; and he received deliveries at the house. These are common activities typical of the use of a dwelling as a living space. Victim also locked and secured the house, had a friend watch the house when he was away, and set up surveillance to protect the house. Taken together, this evidence shows that the house was actually used for living quarters and that, despite his absence for reasons associated with employment, Victim exercised control of the property and availed himself of the possessory and privacy rights of habitation.

**{14}**    We note our assessment of Victim's use of the house and the character of the house is not affected by his absence at the time of the break-in. There is no suggestion in the language of the burglary statute or the UJI defining "dwelling house" that the absence of the occupant at the time of the break-in would affect the character of a structure. *See* Annotation, 20 A.L.R. 4th 349, § 2 (explaining that, except where individual state statutes provide otherwise, courts have held that because the common law "offense of burglary was viewed as one against habitation, . . . there is no requirement that a person be physically present in the residential structure at the time of the breaking and entry in order to constitute the structure 'occupied' or 'inhabited' for purposes of the higher degree of the crime"). New Mexico's modern burglary law no longer requires the unauthorized entry to occur at nighttime, when occupants are likely to be home and perhaps most vulnerable to the violence and terror that might occur during a home invasion. *See Muqqddin*, 2012-NMSC-029, ¶¶ 3, 21. Also, UJI 14-1631 contains the broad terms "customarily used," which does not demand the occupant's presence during the break-in to define the character of the dwelling.

**{15}**    Defendant contends that the house at issue cannot be considered a dwelling because it was under construction, did not have running water or electricity, and there was no evidence that Victim had moved in. Defendant relies on *State v. Ervin*, 1981-NMCA-068, ¶ 3, 96 N.M. 366, 630 P.2d 765, in which this Court applied a common law definition of dwelling house: "a building is not a dwelling before the first occupant has moved in; nor does it continue to be a dwelling after the last occupant has moved out with no intention of returning." *Ervin*'s common law definition of a dwelling house does not control our analysis in this case. Without an occupant or use of the house as a residence in *Ervin*, the opinion was focused on whether the house, previously used as a residence, was abandoned under common law and did not engage in any perceptible analysis of the definition of dwelling house now found in UJI 14-1631. *See Ervin*, 1981-NMCA-068, ¶¶ 3-5 (using common law and out-of-state tests for the evidence and summarily concluding that the UJI defining "dwelling house" adequately instructed the jury). In contrast, the house in the current case was not abandoned but was actually in

use as living quarters—albeit as yet incomplete, but functional and most importantly used as such by Victim.

**{16}** *Ervin* is not without relevance, however. It, too, involved a house that had no running water or electricity and the occupant's temporary absence from the house, though in *Ervin* it was unoccupied for more than a year. *Id.* ¶ 2. This Court's decision to treat that house as a "dwelling house"—despite the long, but temporary, absence of its occupant and despite its lack of readiness to be used as a fully functioning residence— at a minimum reveals our willingness to embrace different types of habitation and degrees of conventional habitability. *See id.* (noting that the burglarized house had not been occupied for over a year; there was no gas, water, and electricity supplied to the house; the mattresses were stacked against the dining room walls and windows; and although the "previous occupant[] was advanced in years and extremely infirm[, t]here was no testimony that [she] did not expect to return"). We believe the state of the interior of the house in the current case, though relevant, is of even less significance because it was actually being used for habitation. Giving more weight to the actual use of a house as living quarters than to the state of completeness of the interior and conventional comforts of a home more closely aligns with the purpose of the residential burglary statute, that is, to protect the security of the occupant and the possessory and privacy rights of habitation. *Muqqddin*, 2012-NMSC-029, ¶¶ 39-45; *see also id.* ¶ 16 (explaining that the basis of burglary is "an offense against the security of habitation or occupancy, rather than against ownership or property" (internal quotation marks and citation omitted)). Thus, we believe the degree to which Victim moved his possessions into the house or the degree to which the interior of the house is finished are not necessarily the most significant considerations in this case because the house had a fully finished and secure exterior and it was actually used as living quarters.

**{17}** Defendant also suggests that a building must be adapted for residential use on "a 24-hour basis" to assume the character of a dwelling under the meaning of the burglary statute, relying on *State v. Hudson*, 1967-NMSC-164, ¶ 11, 78 N.M. 228, 430 P.2d 386. To the extent Defendant contends that a structure must be able to accommodate 24-hour use, we observe that Victim adapted his house for use during the day and night, even if the adaptations were unconventional and appeared to be temporary. Additionally, we are not persuaded that our Supreme Court in *Hudson* was fashioning a rule for defining a dwelling. *See id.* ¶ 10 (explaining that the defendant was *not* asking the Court to consider whether the drugstore was made a dwelling because the drugstore owner sometimes slept there). There is no discussion in *Hudson* of how the drugstore was adapted and no discussion of the language used in UJI 14-1631. In the course of rejecting a separate contention related to the evidence identifying the building, *see Hudson*, 1967-NMSC-164, ¶¶ 10-11, our Supreme Court simply listed the proof offered by the state, including evidence that the owner of the drugstore had adapted it for "occupancy and use by humans . . . on a 24-hour basis[.]" *Id.* ¶ 11. To the extent this was a comment on the sufficiency of the evidence, the language used was broad and would seem to encompass the adaptations made by Victim here.

**C.    Customary Use and Purpose**

**{18}** In addition to Victim's use of the house for living quarters, we also consider whether the State offered proof that Victim's use of the house for living quarters was customary or an established practice such that it assumed the character of a dwelling under UJI 14-1631. Defendant contends that because the evidence shows that Victim only stayed at the house "sometimes," its use as living quarters was merely occasional, not customary, as UJI 14-1631 explicitly requires.

**{19}** We are not persuaded by Defendant's contention that living in a house "sometimes" is necessarily inconsistent with living in a house "customarily," within the meaning of UJI 14-1631. We do not believe that a structure must be used for living quarters continuously in order to be protected as a dwelling house. *See Ervin*, 1981-NMCA-068, ¶¶ 2-4 (holding that, although a home had not been occupied for a year, there was no evidence of abandonment, and thus under common law the house was a dwelling house); *see also* 13 Am. Jur. 2d *Burglary* § 6 (2021) (noting the lack of frequency requirements in burglary statutes and observing that "[a] structure need not be a victim's permanent, continuous residence" and that "intermittent use of a residence does not prevent it from becoming a dwelling house").

**{20}** Moreover, the evidence in the current case demonstrates that it was Victim's typical practice, at least in the three months preceding the burglary, to use the house for habitation when he was not working out of state. Viewing the evidence in the light most favorable to the verdict, we believe the jury could reasonably infer that Victim's use of the house for habitation was sufficiently established to warrant the heightened protections of the security of habitation. *See Samora*, 2016-NMSC-031, ¶ 34; *Muqqddin*, 2012-NMSC-029, ¶¶ 3, 42.

**{21}** As we have indicated, the evidence showed that Victim identified the house as the place where he lived and did not state that he lived anywhere else. He testified that the house was "a new build," that he ran out of funds to complete the interior three months before the break-in, so he had been doing the work himself on his days off and adapted it so he could sleep there. This evidence combined with Victim's receipt of deliveries at the house while he was away, suggests that he treated the house as the place where he would return when he finished his periodic work out of town. Victim testified that he, in fact, returned to the house after working in Texas, five days after police told him about the break-in. Victim had his friend check on the house when he was away. The friend's testimony also suggested that Victim was often back at the house, when he indicated that Victim may be on a schedule where he was away only every other week. From all this evidence, the jury could reasonably infer that Victim had a pattern and practice of returning to the house to live there and work on it when he was away from work, and that he had treated the house as his place of residence in this manner for at least three months before the break-in, the time when he ran out of funds.

**{22}** Closely related to the customary use of the house is the purpose of the house. In addition to the inference that Victim had a practice of using the house for living quarters when he returned to New Mexico, the jury could also reasonably infer that the purpose of the house was for his habitation. Victim's efforts and apparent desire to complete the

house; his efforts to resecure and fix the exterior of the house after the break-in; his adaption of the house for sleeping, eating, and leisure, despite its unfinished state; his use of the property to keep a generator and a camper; his efforts to keep the house secured and surveilled; and his identification of the house as the place where he lived all suggest that the purpose of the house was for habitation at the time of the break-in. It also suggests that Victim intended to treat the house as his dwelling in a permanent way, though its use as habitation would be necessarily intermittent due to the nature of his work. *Cf. Ervin*, 1981-NMCA-068, ¶¶ 2, 5 (holding that the vacant house was a dwelling where there was a temporary absence of the occupant and no testimony that she did not intend to return).

{23}    In sum, because the State presented evidence that the structure was a house with an enclosed, finished exterior; the house was used for habitation in a regular, yet intermittent, way; and the apparent purpose of the house was for habitation, we are less concerned that the interior of the house lacked utilities and was under construction and that the use of the house for habitation was not continuous or conventional. On balance, we hold that the evidence sufficiently established that the structure entered was a dwelling house within the meaning and purpose of the burglary statute and UJI 14-1631.

**CONCLUSION**

{24}    For the reasons set forth above, we affirm Defendant's conviction for burglary of a dwelling house.

**{25}    IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**JACQUELINE R. MEDINA, Judge**