The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: July 15, 2025

**NO. S-1-SC-39949**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JOSEPH MATTHEW GREGORY JONES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
T. Glenn Ellington, District Judge

Bennett J. Baur, Chief Public Defender
Thomas J. Lewis, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Peter James O'Connor, Assistant Solicitor General
Santa Fe, NM

for Appellee

**OPINION**

**VARGAS, Justice.**

{1} The primary question presented by this case is one of statutory interpretation examining whether a portal is a prohibited space under New Mexico's aggravated burglary statute, NMSA 1978, Section 30-16-4 (1963). This Section provides in relevant part that "[a]ggravated burglary consists of the unauthorized entry of any . . . dwelling or other structure, movable or immovable, with intent to commit any felony or theft therein." *Id.* The portal[1] at issue is a covered porch in the backyard of a house that is open to the elements on two sides. The circumstances giving rise to this question arose when Robert Romero (Victim) caught Defendant Joseph Matthew Gregory Jones in his backyard in the middle of the night, allegedly attempting to burglarize Victim's home. A struggle ensued, culminating in Defendant shooting Victim in the backyard.

{2} Defendant was charged in relevant part with aggravated burglary and felony murder. At trial, Defendant did not contest that he was the intruder, instead filing a

---

[1]We use *portal* throughout to refer to the architectural feature common in New Mexico, defined as "[a] covered entryway or porch-like structure leading into a home, a church, or a public building—sometimes quite elaborate. Also may refer to a covered patio attached to a home." *The Guide to New Mexico Architecture*, available at https://nmarchitectureguide.org/glossary/ (last visited July 9, 2025).

motion for directed verdict on the grounds that he never entered a prohibited space that would support the underlying aggravated burglary charge under Section 30-16-4. The district court denied Defendant's motion, and Defendant was ultimately convicted of aggravated burglary and felony murder. After receiving a life sentence, Defendant exercised his right to appeal directly to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court.").

{3}   He raises three issues on appeal: (1) whether the unenclosed portal is a structure under the aggravated burglary statute;[2] (2) whether the district court erred in inserting the word "portal" into the aggravated burglary jury instruction; and (3) whether the district court erred in admitting evidence of guns, ammunition, and other accessories unconnected to the murder weapon or the shooting that were recovered in Defendant's possession nearly two years later.

{4}   For the reasons that follow, we conclude the district court erred in denying Defendant's motion for directed verdict because the portal is not a prohibited space under the aggravated burglary statute. Accordingly, we vacate Defendant's

---

[2]Defendant at times refers to the burglary statute, NMSA 1978, Section 30-16-3 (1971), rather than the aggravated burglary statute, Section 30-16-4. Because Defendant was convicted of aggravated burglary and the language at issue is identical in both statutes, we refer hereinafter to the aggravated burglary statute.

convictions for felony murder and aggravated burglary. As we explain, however, the State may elect to reprosecute Defendant on the same or lesser charges without violating double jeopardy. Defendant's second issue with respect to the jury instructions is rendered moot by our conclusion that the portal is not a protected structure under Section 30-16-4, and we need not address it. Finally, addressing the evidentiary issue to provide guidance in the event it arises on remand, we conclude the district court erred in admitting evidence of Defendant's possession of guns, ammunition, and accessories unconnected to the shooting, as this evidence was irrelevant.

## I.      BACKGROUND

### A.      Facts

{5}      Shortly before 2:00 a.m. on the night of July 30, 2018, Victim's wife awoke to a crash, and heard Victim frantically call her name from the backyard of their home. When Victim's wife opened the door to their backyard, she saw her husband struggling with an intruder. The intruder was wearing a gray hoodie that was cinched, revealing only dark eyes and eyebrows. After Victim yelled for his wife to get help, she ran back in the house to call the police. Shortly before Victim's wife attempted to call the police, she heard a gunshot. After hearing the gunshot, she

rushed back outside to find Victim slumped over a small retaining wall just beyond the portal.

{6}     Police arrived shortly thereafter but were unable to locate the suspect. A number of relevant items, however, were left at the scene of the crime. These items—in addition to testimony by the Victim's wife—would ultimately serve as the primary evidence tying Defendant to the crime. Police found a trash can turned upside-down pushed up against the gate on the side of the yard, which Defendant concedes "was presumably the means by which the intruder gained access to [Victim's] back yard." A bullet casing was recovered in the gravel between the retaining wall and the portal. Expert testimony would later tie this casing to the murder weapon that killed Victim. Police found a flashlight left by Defendant further out in the yard near a gas grill. Victim's wife also found a pair of prescription eyeglasses, picked them up and took them inside the house, and later gave them to police. The exact location where the glasses were found is unclear. Upon examination of the doors, windows, and other areas, police discovered no evidence that Defendant attempted to enter the home itself.

{7}     Nearly two years later, utilizing DNA recovered from the eyeglasses and the flashlight, police found a match in a genealogy database. During a subsequent search of Defendant's apartment, police found a bag that contained three handguns,

ammunition, and a myriad of gun accessories and magazines. One of the guns in the bag, a Glock .357 (the murder weapon), was connected via ballistic analysis to the bullet that killed Victim. The other two guns were also pistols: a Ruger .9 millimeter and a Browning .380. Police also found a gray hoodie that Defendant had modified to fit snugly around his face and an eyeglass prescription Defendant concedes matched the eyeglasses recovered from the scene of the crime.

**B.     Procedural History**

{8}     Defendant was charged with aggravated burglary and felony murder. Defendant filed a motion for directed verdict, contending that he never entered a prohibited space that would support the underlying aggravated burglary charge under Section 30-16-4. The district court orally denied Defendant's motion, first reasoning that the back portal was "visually" part of the dwelling; that the stucco was the same color as the house; and that the portal was covered and had a hard surface floor with entrances to the interior of the home from the portal. Later in its ruling, the district court noted that the portal "does not have a set physical barrier," and the facts could be viewed in such a manner to support "that, although not completely confined, the occupants have an expectation of privacy and quiet enjoyment in the use of their portal."

{9} A closer examination of the district court's ruling reveals uncertainty with respect to the scope of the prohibited space under the aggravated burglary statute. At one point, the district court appeared to indicate that the portal was the outer boundary of the space protected under the statute. Immediately thereafter, however, the district court stated that "the portal—that space—does not have a set physical barrier, the visible barrier is the retaining wall *immediately behind the portal* made up of what appears to be moss rock, and then there is a small gravel path or area off of the hard surface slab" between the retaining wall and the covered portion of the portal. This second statement suggests that the district court viewed the prohibited space under the statute to extend *beyond* the portal itself, up to the point of the retaining wall. This ambiguity resulted in an unclear ruling as to what precisely constituted a prohibited space as contemplated by the aggravated burglary statute in a case where the homicide took place somewhere between the retaining wall that was just beyond the portal and the home itself.

{10} Ultimately, after the district court denied the motion for a directed verdict, Defendant was convicted of aggravated burglary and felony murder. The district court sentenced Defendant to life imprisonment, and Defendant appealed. *See* N.M. Const. art. VI, § 2.

6

## II.  DISCUSSION

### A.  The Portal Is Not a Structure Under the Aggravated Burglary Statute

{11}  While Defendant provides a framework for both insufficiency of the evidence and statutory interpretation for legal error, it is uncontested Defendant does not develop any argument that his conviction must be reversed for insufficient evidence—*i.e.*, that "the state's evidence failed to establish beyond a reasonable doubt some or all of the factual elements of the offense charged." *State v. Revels*, 2025-NMSC-021, ¶ 27, ___P.3d ___ (text only)[3] (citation omitted). Indeed, the State acknowledges that "Defendant does not contest any of the evidence presented —neither at trial nor on appeal." Instead, Defendant's challenge focuses on the construction of New Mexico's aggravated burglary statute, alleging that a portal is not a structure as that term is used in Section 30-16-4.

### 1.  Standard of review

{12}  Statutory construction is a question of law subject to de novo review. *State v. Off. of Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶ 13, 285 P.3d 622 (explaining that construing New Mexico's burglary statute is a matter of statutory construction

---

[3]The parenthetical "(text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

that this Court reviews de novo); *see also State v. Mestas*, 2016-NMCA-047, ¶ 8, 370 P.3d 805 ("In considering [the d]efendant's argument that his conduct is outside the scope of that described to be burglary . . . , we review the district court's denial of [the d]efendant's motion for a directed verdict de novo.").

**2.      History of burglary in New Mexico: *Foulenfont* and *Muqqddin***

{13}      Both the State and Defendant rely almost exclusively upon *State v. Foulenfont*, 1995-NMCA-028, 119 N.M. 788, 895 P.2d 1329, and *Muqqddin*, 2012-NMSC-029. We, therefore, provide a brief overview of each case to contextualize the parties' arguments.

{14}      In *Foulenfont*, the defendants climbed a chain-link fence surrounding a business that sold mobile homes. 1995-NMCA-028, ¶ 2. The Court of Appeals was required to consider whether a fence "constitute[d] a 'structure' under our burglary statute." *Id.* ¶ 1 (citation omitted). In affirming the district court's dismissal of the charges, the Court of Appeals concluded that the fenced area was not a structure under New Mexico's burglary statute. *Id.* ¶¶ 1, 10. It reasoned that, "unlike a fence, all of the enumerated objects in the statute are capable of completely confining people and their property." *Id.* ¶ 11. Finally, it rejected the state's contention that the mobile home business was receiving disparate treatment due to the fact that it "operate[d] in an outdoor setting." *Id.* ¶ 12. Rather, the Court of Appeals explained,

"[t]he burglary statute would be applicable if [the d]efendants had made an unauthorized entry into an office or a mobile home." *Id.* But "[w]here the unauthorized entry merely consists of climbing over a fence, businesses and other open property are protected under our criminal trespass statute." *Id.*

{15}    In *Muqqddin*, the Court addressed whether puncturing the gas tank of a van in one case or removing the rear wheels of a car in another fell under the burglary statute. 2012-NMSC-029, ¶¶ 7, 11. More broadly, *Muqqddin* served as a vessel for the Court to convey serious concern regarding the unprecedented judicial expansion of the outer limits of what amounts to protected space under the burglary statute— "an expansion that has occurred without any parallel change in the statute." *Id.* ¶ 1. After a thorough examination of New Mexico's burglary jurisprudence, common-law origins, and legislative intent, we concluded "that our case law has gone astray, and that we must alter our course." *Id.* In reversing the convictions in that case, *id.*, we provided a roadmap of principles to consider when examining whether a particular space is prohibited under New Mexico's burglary statute. We consider these principles while remaining mindful that, "[f]irst and foremost, what is being punished as a felony under Section 30-16-3 is a harmful entry." *Muqqddin*, 2012-NMSC-029, ¶ 60.

{16} Of particular relevance here is the requirement that a space be enclosed to qualify as a structure. *Muqqddin* explained that, "in order for an area to be considered prohibited space under Section 30-16-3, it must have some sort of enclosure" because "[i]t is the nature of the enclosure that creates the expectation of privacy. Enclosure puts the public on notice." *Id.* ¶¶ 44-45. In other words, courts examine the physical nature of the space at issue to discern whether it qualifies as a structure under the burglary or aggravated burglary statutes. *See Mestas*, 2016-NMCA-047, ¶ 27 ("The crucial question in determining whether an area is protected is whether or not its physical characteristics create an '[e]nclosure [that] puts the public on notice.'" (quoting *Muqqddin*, 2012-NMSC-029, ¶ 45 (alterations in original))). *Muqqddin* relied upon *Foulenfont* in reaching its conclusion, reasoning that "[e]ach of the enumerated structures in Section 30-16-3 either inherently has, or has been interpreted to require, some sort of enclosure. Accordingly, we believe it is this enclosed space that the Legislature intended to protect." *Muqqddin*, 2012-NMSC-029, ¶ 44.

{17} Crucially, in considering the outer boundaries of a structure, *Muqqddin* also rejected the imaginary plane theory, which "allow[s] a burglary charge to stand whenever a defendant 'breaks the close' of a structure, meaning the defendant crosses some imaginary plane created by some portion of a structure that is by its

nature open to the elements." *Id.* ¶ 46 (citation omitted). We rejected the theory in part because, in addition to a lack of notice, "the concept of an imaginary plane is ambiguous, creating more questions than it answers and [is] subject to prosecutorial abuse." *Id.* ¶ 47. We provided an example highlighting such ambiguity by applying the invisible plane theory to a house—"Would the close of a house extend from the eaves to the foundation, such that stealing a shutter, obviously attached to the outside requiring no entry of the house itself, becomes a burglary?" *Id.* In contrast with the ambiguity that comes with an open structure that is "by its nature open to the elements," we clarified that our "reasoning does not apply to such things as an open window" because "[a] window . . . creates an opening in an enclosure . . . . As such, a burglary can be committed through an open window." *Id.* ¶¶ 46, 48.

{18}  Finally, in *Muqqddin*, we cautioned against relying upon burglary jurisprudence from other jurisdictions without examining whether a statute in another jurisdiction "differs so greatly from ours that it serves a different purpose." *Id.* ¶ 28. We provided one case—*State v. Gonzales*, 2008-NMCA-146, 145 N.M. 110, 194 P.3d 725—as an example of such a flawed analysis. *Muqqddin*, 2012-NMSC-029, ¶ 28. The structure in *Gonzales*, which *Muqqddin* described as an open-air porch attached to a commercial building with a concrete floor and a roof that is open on three sides, is sufficiently similar to the portal here that it is necessary to

11

clarify *Muqqddin*'s treatment of *Gonzales*. *Id.* ¶¶ 22, 28. The *Muqqddin* Court explained that *Gonzales* was flawed because it relied upon a case from Georgia, even though the "Georgia statute indicat[es] that a structure or *a part of a structure* can be burglarized, an addition that is absent from New Mexico's statute." *Id.* (referring to *Gonzales*'s reliance on *Garrett v. State*, 578 S.E.2d 460 (Ga. Ct. App. 2002)).

{19} For the reasons that follow, we clarify that, even though *Muqqddin* did not explicitly overrule *Gonzales*, it has little, if any, remaining precedential value. The Court of Appeals' holding in *Gonzales* that the open-air porch constituted a structure conflicts with *Muqqddin*, which explains that entering "some portion of a structure that is by its nature open to the elements" is not burglary in New Mexico. *Muqqddin*, 2012-NMSC-029, ¶ 46. Further, the *Gonzales* Court relied upon *State v. Rodriguez*, 1984-NMCA-034, ¶¶ 4-7, 101 N.M. 192, 679 P.2d 1290, *abrogated by Muqqddin*, 2012-NMSC-029, ¶ 38—a case that endorsed the imaginary plane theory in holding that the open bed of a pickup truck was a prohibited space under the burglary statute. *See Gonzales*, 2008-NMCA-146, ¶ 8 (discussing these facts of, and relying upon, *Rodriguez*). We concluded in *Muqqddin* that *Rodriguez* is no longer good law. *See* 2012-NMSC-029, ¶ 38. Ultimately, the *Muqqddin* Court identified *Gonzales* as one of the cases in which the Court of Appeals significantly expanded the reach of the burglary statute without legislative authorization, which, in turn, supported this

Court's conclusion that our precedent had "gone astray" such that a course correction was necessary. *Id.* ¶¶ 1, 22. As a result, we do not rely upon the faulty analysis applied in *Gonzales*.[4]

### 3. Post-*Muqqddin* precedent

{20} We have not had occasion to provide guidance squarely addressing the outer limits of what qualifies as protected space under the burglary or aggravated burglary statutes since *Muqqddin*. Nevertheless, in *State v. Holt*, 2016-NMSC-011, 368 P.3d 409, we relied upon *Muqqddin* in the context of breaking and entering. Precedent from our Court of Appeals, though not binding on this Court, likewise supports and is consistent with our mandate set forth in *Muqqddin* establishing that first and

---

[4]The dissent, in ¶ 85, contends that *Muqqddin* critiqued *Gonzales*, but ultimately endorsed its result. We disagree. Nothing in the *Muqqddin* opinion suggests the *Muqqddin* Court endorsed the result in *Gonzales*, and we will not read language into *Muqqddin* that does not exist. Indeed, if *Muqqddin* intended to critique the approach of *Gonzales* while endorsing the result, it certainly could have done so, as it did with a different *Gonzales* case in the same opinion. *See* 2012-NMSC-029, ¶¶ 30-31. The dissent further contends that "*Gonzales* is sufficiently analogous . . . to support that the portal here is a structure." *Dissent* ¶ 83. But the dissent offers nothing from our jurisprudence supporting the result reached in *Gonzales*, a case that is not binding on this Court. Importantly, we note that the State did not rely upon *Gonzales*, 2008-NMCA-146, in its briefing before the Court. Indeed, at oral argument, the State asserted that *Gonzales* "doesn't seem to make a difference" in this case. It is not our practice to promulgate law without argument from the parties, and we decline to do so here. *See generally Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53.

13

foremost courts must examine the physical characteristics of a space to discern whether it qualifies as a structure. *See, e.g.*, *Mestas*, 2016-NMCA-047, ¶ 27.

{21} In *Holt*, the question at issue was whether there was an unauthorized entry, *not* whether the home was a structure. *See* 2016-NMSC-011, ¶ 1. *Holt* is therefore of limited value here. *See Dominguez v. State*, 2015-NMSC-014, ¶ 16, 348 P.3d 183 ("[T]he general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)). Nevertheless, we briefly address *Holt* to highlight that it defined the boundary of the home in a manner consistent with the structural mandates set forth in *Foulenfont* and *Muqqddin*. *Contra dissent* ¶ 81 (suggesting that *Holt* embraced an abandonment of portions of *Foulenfont*). In discerning whether the entry in *Holt* was unauthorized, we relied upon *Muqqddin* to reiterate that courts examine the physical nature of the structure to define the outer boundary of an enclosure. *Holt*, 2016-NMSC-011, ¶¶ 14, 17. Based on this approach, we concluded that "putting one's fingers behind a window screen affixed to a residential dwelling is an intrusion into an enclosed, private, prohibited space" because a window screen provides protection against unauthorized intrusion. *Id.* ¶ 18. Put simply, the window screen, along with the rest of the secured home, was capable of completely confining people and their property; the screen formed a sufficiently sealed-off enclosure that put the public on notice.

14

{22}  *Mestas* is likewise consistent with *Muqqddin* and the principles we set forth today. In *Mestas*, the Court of Appeals considered whether a clerk's office in a hotel was an enclosure under the burglary statute. 2016-NMCA-047, ¶¶ 2, 3, 24. Quoting *Muqqddin*, it reiterated that "[t]he crucial question in determining whether an area is protected is whether or not its physical characteristics create an '[e]nclosure [that] puts the public on notice.'" *Mestas*, 2016-NMCA-047, ¶ 27 (quoting *Muqqddin*, 2012-NMSC-029, ¶ 45 (alterations in original)). It relied upon *Foulenfont* to support that in order for a space to be enclosed under *Muqqddin*, it "must be 'capable of completely confining people and their property.'" *Mestas*, 2016-NMCA-047, ¶ 24 (quoting *Foulenfont*, 1995-NMCA-028, ¶ 11). The *Mestas* Court called upon this language throughout the opinion, from start to finish. *See, e.g., id.* ¶ 2 (stating that "[a] mechanized 'shutter' or 'shield' was built into a recess in the ceiling above the counter, allowing employees to *completely enclose* the desk area (thereby preventing any access from the lobby)" (emphasis added)); *id.* ¶ 22 ("The clerk's office was designed to remain separate from the public lobby area: the only way to enter was through a locked door or over a chest-high counter that could *be completely shut with a retractable barrier*." (emphasis added)); *id.* ¶ 25 ("Here, the clerk's office was capable of *completely confining* the motel clerk, his desk, and the locked drawer containing cash: a locked door prevented access from the lobby, and the opening

15

above the chest-high counter could be closed and secured. In short, the enclosure's *physical characteristics* were such that a reasonable person would expect some protection from unauthorized intrusions." (emphasis added) (internal quotation marks and citation omitted)). If any confusion remained as to what the *Mestas* Court meant when it stated that the office in that case was capable of completely confining people and their property, it used different terms to reiterate that "[t]he chest-high counter separating the public hotel lobby from the otherwise *sealed-off* clerk's area was sufficient to create such an enclosure and put the public on notice that it was off-limits." *Id.* ¶ 27 (alteration in original) (emphasis added).

{23} In *State v. Shelby,* 2021-NMCA-064, 499 P.3d 671, the defendant did not contest whether the home was a structure. Instead, the defendant contended that (1) the home was not a dwelling because the interior of the home was under construction, (2) it did not have electricity or running water, and (3) the house was not sufficiently used as living quarters to qualify as a dwelling. *See id.* ¶ 1. *Shelby*, like *Holt*, is therefore of limited value here. *See Dominguez*, 2015-NMSC-014, ¶ 16 ("[T]he general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)); *contra dissent* ¶¶ 71, 81 (relying upon *Shelby* and suggesting that it abandoned *Foulenfont*). Nevertheless, *Shelby* abided by the principle that a structure must be fully enclosed or sealed-off in a

16

manner consistent with our opinion today. *Shelby* cited *Mestas* to support its view that, "under *Muqqddin*, we must examine the physical characteristics of an area to determine whether the space is private, enclosed, or *sealed-off* from public entry and protected by the burglary statute." *Shelby*, 2021-NMCA-064, ¶ 8 (emphasis added) (citing *Mestas*, 2016-NMCA-047, ¶ 27). It described the home in that case as having a "fully finished and secure exterior," *id.* ¶ 16, as having "a screened-in porch, enclosed with a roof, walls, doors, windows, and locks," *id.* ¶ 12. Put simply, the home was enclosed—sealed-off in a way that put the public on notice that it was a prohibited space. While the dissent highlights the interior furnishing of the space, *dissent* ¶ 72, the *Shelby* Court concluded that "the degree to which [the v]ictim moved his possessions into the house or the degree to which the interior of the house is finished are not necessarily the most significant considerations in this case because the house had a *fully finished and secure exterior* and it was actually used as living quarters." 2021-NMCA-064, ¶ 16 (emphasis added). Indeed, the common thread apparent in *Muqqddin* and subsequent precedent is not how the space was being used but the requirement that the space be enclosed. *See enclose, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020) ("to close in: surround (enclose a porch with glass)").

17

**{24}** While the dissent suggests that these post-*Muqqddin* cases and indeed *Muqqddin* itself establish an attempt to somehow "reinterpret" *Foulenfont* or abandon *Foulenfont*'s inquiry that a structure must be capable of completely confining people and their property, we believe our analysis sufficiently explains why that is not the case. *See dissent* ¶ 81 (suggesting that *Holt* recognized a "reinterpretation of *Foulenfont*"); *id.* ¶¶ 79-81 (suggesting that post-*Muqqddin* precedent largely abandoned the *Foulenfont* requirement that a space must be "'capable of completely confining people and their property'" in order to qualify as a structure (quoting *Foulenfont*, 1995-NMCA-028, ¶ 11)). Indeed, *Mestas* alone disproves this point, explicitly relying upon *Foulenfont* and stating no less than four separate times that the space there was either capable of being completely confined or was sealed-off. *See Mestas*, 2016-NMCA-047, ¶¶ 2, 22, 24, 25, 27. *Contra dissent* ¶ 81. The result is that post-*Muqqddin* precedent remains consistent in requiring that a space be fully enclosed to qualify as a structure and, in contrast with each of these cases and the dictionary definition, the dissent does not explain how a portal that is, as here, completely open on two sides could qualify as being fully enclosed or "sealed-off" like the clerk's office in *Mestas* or either of the homes in *Shelby* and *Holt*.

18

## 4. The portal is not a structure

{25} Here, the portal does not qualify as a prohibited space under New Mexico's aggravated burglary statute because it plainly is not "capable of completely confining people and their property." *Foulenfont*, 1995-NMCA-028, ¶ 11. Therefore, whether we analyze the portal under the statute's "dwelling" or its "other structure," the portal would not qualify as a prohibited space under even the broadest reading of the statute; it is not a structure. *See* § 30-16-4 (listing certain structures, including a "dwelling," and providing a catchall for "other structure[s]"); *see also* UJI 14-1631 NMRA (defining a "dwelling house" as "any *structure*, any part of which is customarily used as living quarters" (emphasis added)). Rather, the portal is more like "some portion of a structure that is by its nature open to the elements," which is not a prohibited space under our case law. *See Muqqddin*, 2012-NMSC-029, ¶¶ 46-47. Even under a generous interpretation of the facts, as the State construes them, a portal with two open sides would not qualify as a structure because, again, those two sides cannot be enclosed or sealed-off in any way. *See Foulenfont*, 1995-NMCA-028, ¶ 11 ("[U]nlike a fence, *all of the enumerated objects in the statute are capable of completely confining people and their property.*" (emphasis added)); *accord Mestas*, 2016-NMCA-047, ¶¶ 22, 25 (concluding that an office in a motel was a structure under the burglary statute because "the only way to

19

enter was through a locked door or over a chest-high counter that could be completely shut with a retractable barrier").

{26} In other words, under the facts of this case, there was simply no way to close off the two sides of the portal that were open to the elements in a way that would provide any meaningful distinction between (1) trespass by jumping the fence into the backyard and (2) crossing the imaginary plane into the portal that, if we were to affirm the district court, would constitute aggravated burglary. *See Muqqddin*, 2012-NMSC-029, ¶ 46 (rejecting the imaginary plane theory that would "allow a burglary charge to stand whenever a defendant . . . crosses some imaginary plane created by some portion of a structure that is by its nature open to the elements"); *Foulenfont*, 1995-NMCA-028, ¶ 12 (explaining that the criminal trespass statute rather than burglary applies "[w]here the unauthorized entry merely consists of climbing over a fence"). Accordingly, a conclusion that the portal itself is a structure would contradict our rejection of the invisible plane theory in *Muqqddin*. As the district court itself stated, the portal "does not have a set physical barrier," and it is "not completely confined." Therefore, the portal does not satisfy the requirements set forth in *Foulenfont* and *Muqqddin* because Defendant necessarily is being punished for crossing an invisible plane when the portal is plainly open to the elements on two sides with no physical barrier.

20

{27} To shore up its conclusion that the portal is a protected space under the aggravated burglary statute, the district court noted that the facts could be viewed to support that "the occupants have an expectation of privacy and quiet enjoyment in the use of their portal." But that is not the test. The Legislature defines aggravated burglary, in relevant part, as "the unauthorized entry of any . . . dwelling or other structure"—not of every space where an occupant has an expectation of privacy. Section 30-16-4. Therefore, contrary to the district court's reasoning, we clarify that an expectation of privacy alone does not transform a space into one that is protected under the aggravated burglary statute. "[B]urglary's original purpose, the protection of the security of habitation," remains relevant, *Muqqddin*, 2012-NMSC-029, ¶ 34, but "burglary has a greater purpose than merely protecting property," *id.* ¶ 39. Instead, our burglary statutes "aim to protect against the feeling of violation and vulnerability that occurs when a burglar invades one's personal space." *Id.* ¶ 43. We recognized in *Muqqddin* that "[o]ne does not have the same feeling of personal violation when gas has been siphoned from our vehicle or when someone steals a wheel as we do when an intruder has been in our home or office rifling through our most intimate and treasured belongings." *Id.* While more intrusive than siphoning gas, similarly, here, we recognize that the intrusion into a portal, like an intrusion into any unenclosed porch, stoop, or other space adjacent to one's home, does not

21

invoke the same degree of violation or fear as that which occurs when a burglar invades the interior of one's home such as the living room or bedroom—the "most intimate" of spaces. *Id.* And we emphasize that unauthorized entry of a portal is punishable under other statutes. *See id.* ¶ 40 ("The law [against burglary] was not designed solely to deter trespass and theft, as those are prohibited by other laws."). Our conclusion is consistent with the Legislature's authority to define crimes as it sees fit and accordingly honors its choice not to include one's unenclosed backyard as a space that can be burglarized. *See id.* ¶¶ 37, 50 (concluding that "[i]t is for the Legislature alone to define statutory criminal acts" and explaining that it is a significant factor in our analysis if the criminal acts charged are punished as "lesser crimes").

{28}     Put simply, it is the physical barrier of the structure that creates the expectation of privacy, not the other way around. *Id.* ¶¶ 44-45 (explaining that "it is th[e] enclosed space that the Legislature intended to protect[;] . . . [i]t is the nature of the enclosure that creates the expectation of privacy"); *see also Holt*, 2016-NMSC-011, ¶¶ 17-18 (concluding that "putting one's fingers behind a window screen affixed to a residential dwelling is an intrusion into an enclosed, private, prohibited space . . . [because i]t is reasonable for the citizens of New Mexico to expect that their window screens afford them protection from unauthorized intrusions"). Accordingly, we

22

hold that the unauthorized entry of the portal is not within the scope of "unauthorized entry of any . . . dwelling or other structure" as defined in Section 30-16-4, and we reaffirm that the focus is whether the physical nature of the structure is sufficiently enclosed such that a reasonable person would expect protection from unauthorized entry. *See Muqqddin*, 2012-NMSC-029, ¶ 45. The portal contained no screen, door, or other barrier that a reasonable person would expect to provide some level of protection from unauthorized intrusion or communicate to another person that the space is prohibited for purposes of the aggravated burglary statute.

{29} Instead, the district court's difficulty in defining the structure serves as an example of the ambiguity this Court warned of in *Muqqddin*. At times, the district court appeared to rule that the portal was the outer limit of the structure under the statute, and at other times it ruled that the structure extended beyond the portal itself, at least to the retaining wall beyond the portal. *See Muqqddin*, 2012-NMSC-029, ¶ 47 (explaining that "the concept of an imaginary plane is ambiguous, creating more questions than it answers and [encouraging] prosecutorial abuse"). This ambiguity and uncertainty as to where the structure begins and ends—especially in a case where the homicide took place somewhere between the retaining wall and the home— highlights the precise concerns expressed in *Muqqddin*.

23

{30}     As a point of illustration, the district court concluded that—although it had no physical barrier, was not a confined space, and was "an extra room *outside*" of the house—the portal was nonetheless a structure because it had outdoor patio furniture and the district court heard testimony that it was an extension of the living space. If we were to define a statutorily prohibited space by a victim's furnishings or subjective testimony with respect to the use of the space, as the district court did here, victims who spend most of their time outside but who cannot afford to purchase patio furniture may only receive the protection of trespass, whereas victims who have the means to furnish their patio but may not spend any time on the patio would receive the protection of the burglary statute. This uncertainty would likely result in a fact-intensive inquiry based upon testimony from each victim, as opposed to the approach outlined under *Muqqddin*, which objectively examines whether the structure is an enclosure capable of protecting from intrusion. *See Muqqddin*, 2012-NMSC-029, ¶ 45 (explaining that "[t]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusions" (internal quotation marks and citation omitted)). We decline to follow such an inequitable and uncertain approach. *See id.* ¶ 47.

{31}     *Muqqddin* also teaches that "courts must be cognizant of the disparity in potential penalties that can stem from a burglary charge due to its unique place in our jurisprudence." *Id.* ¶ 62. There, the Court examined the potential disparity between the burglary of a commercial building or the passenger space of a vehicle and attempting to steal gasoline by puncturing a hole in the tank of a car. *Id.* ¶¶ 62-63. Here, a disparity would result if we interpreted the statute to punish entering the most intimate of spaces, such as a living room or bedroom, the same as climbing over a gate in a backyard, the entry the State contends constitutes aggravated burglary in this case. Accordingly, this disparity likewise counsels in favor of a conclusion that the portal is not a prohibited space.

{32}     Nonetheless, even if we were to view the portal as an "other structure" that is not specifically enumerated in the aggravated burglary statute—as the district court appeared to do at times—the rule of ejusdem generis also supports our conclusion that the portal is not a prohibited space. *See* § 30-16-4 ("Aggravated burglary consists of the unauthorized entry of any vehicle, watercraft, aircraft, *dwelling* or *other structure*." (emphasis added)). Ejusdem generis provides "that where general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those

25

specifically mentioned." *Muqqddin*, 2012-NMSC-029, ¶ 29 (text only) (citation omitted). That is, any other structure that is not specifically enumerated must contain "an enclosure similar to a vehicle, watercraft, aircraft, or dwelling, and not just a fenced-in area." *Id.* (text only) (citation omitted). Here, the portal itself does not include a gate, screen, door, or other feature that would aid in fully enclosing the space. Therefore, to conclude that the portal is a structure under the aggravated burglary statute would require us to construe the portal in such a broad manner that it would contradict the statutory class of items because "all of the enumerated objects in the statute are capable of completely confining people and their property." *See Foulenfont*, 1995-NMCA-028, ¶ 11. As the portal is not capable of completely confining people or property, we cannot reach such a conclusion.

{33} Finally, it is a bedrock precept of the law that a crime "must be defined with appropriate definiteness." *State v. Bybee*, 1989-NMCA-071, ¶ 12, 109 N.M. 44, 781 P.2d 316 (quoting *Pierce v. United States*, 314 U.S. 306, 311 (1941)). As a result, even if we were uncertain as to whether the portal constituted a structure under the aggravated burglary statute, such uncertainty clearly raises "serious doubts as to whether the Legislature intended to punish [Defendant's] actions as [aggravated] burglary. Under the rule of lenity, that ambiguity must be resolved in" Defendant's favor. *Muqqddin*, 2012-NMSC-029, ¶ 58. We reaffirm that, "[i]f the Legislature

26

wants to expand burglary, blur the lines between crimes, and create overlaps, then it should be left to the Legislature to do so. But in the absence of such legislative action, trial courts and prosecutors should exercise caution in the use of *judicial* power to act as surrogates for that which the Legislature has not done." *Id.* ¶ 63.

{34} At its core, the dissent suggests that a structure for purposes of the burglary and aggravated burglary statutes should be governed by an individual's subjective expectation of privacy rather than the physical nature of the space, upon which an objectively reasonable person would expect protection from unauthorized intrusion. *Dissent* ¶¶ 55, 58. We find this approach unworkable and unsupported by precedent. Notably, the dissent's interpretation of the burglary statue represents an expansion without legislative authorization to include any space that an individual subjectively believes to be private. This interpretation ignores the requirement that crimes must be sufficiently defined such that a person receives notice of what is illegal, and what is not. *See Pierce*, 314 U.S. at 311 ("[J]udicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness."); *accord Muqqddin*, 2012-NMSC-029, ¶¶ 47-49 ("Without . . . legislative guidance, the courts should not be placed in the position of inventing fictions to expand the definition of criminal activity. . . . This is not the first time our courts have cautioned against the continued expansion

27

of the crime of burglary without legislative license."). Indeed, "[i]f the Fourteenth Amendment is violated when a person is required to speculate as to the meaning of penal statutes . . . or to guess at (the statute's) meaning and differ as to its application, . . . the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964) (internal quotation marks and citations omitted).

{35} Under the dissent's view, a person would have no opportunity to even engage in speculation as to a victim's subjective expectation of privacy before committing the act in question, which the dissent suggests governs whether entering a particular space is a crime. *Dissent* ¶¶ 55, 58-59, 70 ("[T]he expectation of privacy and the security of the inhabitant should govern this analysis" rather than the nature of the structure, which the dissent relegates to a mere "architectural tool"). Applying the dissent's rationale, the meaning of the "structure" requirement contained within the aggravated burglary statute would not be revealed until a victim testifies at trial and expresses their view of privacy, which inevitably varies person to person, city to city. Furthermore, in the unfortunate circumstance where a victim has been killed or otherwise incapacitated and no one else is available to testify, it is unclear how the

state would establish the inhabitant's subjective expectation of privacy. Such a standard is not only unworkable—it raises constitutional concerns that cannot be overcome. *See Bouie*, 378 U.S. at 351. ("'[A] statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law[.]' . . . 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.'" (citation omitted)). Under this same analysis, we disagree with the dissent's view that whether a space is a structure prohibited by the burglary statute is a question for the jury. *See dissent* ¶ 89.

{36}     As a final but important note, none of the cases upon which the dissent relies support that an individual's subjective expectation of privacy governs the analysis. For example, in *Holt*, we did not focus on whether the victim thought the space at issue was private in order to discern whether it was a structure that could be entered. *See generally* 2016-NMSC-011, ¶¶ 17-19. Nor did the Court in *Muqqddin* examine whether there was sufficient testimony to support the subjective expectation of privacy with respect to the gas tank or tires. In *Mestas*, a case the dissent heavily relies upon, the Court of Appeals engaged in no discernable analysis as to whether the hotel clerk subjectively believed the space was a structure. Instead, it focused on

the physical characteristics of the space to discern whether it was a structure within the scope of the burglary statute. *See* 2016-NMCA-047, ¶ 27 ("The crucial question in determining whether an area is protected is whether or not its *physical characteristics* create an enclosure that puts the public on notice." (text only) (emphasis added) (citation omitted)); *id.* ¶ 25 ("[T]he enclosure's *physical characteristics* were such 'that a reasonable person would expect some protection from unauthorized intrusions.'" (emphasis added) (quoting *Muqqddin*, 2012-NMSC-029, ¶ 45)); *id.* ¶ 29 (relying upon "the *physical attributes* of the clerk's area" in upholding the defendant's convictions (emphasis added)). Put simply, the test is whether the physical composition of the structure is such that an objectively "'reasonable person would expect some protection from unauthorized intrusions,'" rather than the subjective expectations of the individual. *Muqqddin*, 2012-NMSC-029, ¶ 45 (citation omitted); *accord Holt*, 2016-NMSC-011, ¶ 16 (explaining that the relevant expectation of "'privacy and the victim's feeling of being personally violated'" under the modern burglary statute "extends to all *enclosed*, private, prohibited spaces." (emphasis added) (citation omitted)). With this perspective in mind, we proceed to address the State's arguments to support that the portal is a structure under the aggravated burglary statute.

30

## 5.    The State's arguments are unpersuasive

{37}    *Foulenfont*, according to the State, is distinguishable on two grounds: (1) the space at issue in *Foulenfont* was a commercial property, and (2) unlike the portal, a fence "surrounding an open air storage yard is not" an enclosure under the burglary statute. First, the Court of Appeals in *Foulenfont* did not distinguish between commercial and residential property. Instead, as discussed above, it distinguished between enclosed and open-air spaces, reasoning that, "unlike a fence, all of the enumerated objects in the statute are capable of completely confining people and their property." *Foulenfont*, 1995-NMCA-028, ¶ 11. And, in contrast with the State's second contention that the nature of the property as an "open air storage yard" controlled the *Foulenfont* Court's analysis, the Court rejected the notion that the mobile home business was receiving disparate treatment due to the fact that it "operate[d] in an outdoor setting." *Id.* ¶ 12. Rather, the Court of Appeals explained, "The burglary statute would be applicable if [the d]efendants had made an unauthorized entry into an office or a mobile home." *Id.*

{38}    As to *Muqqddin*, the State largely avoids grappling with the legal principles established by this Court, instead contending that the case is factually distinguishable because "here the portal is not an open-air space or property left in the open to public purview." In further attempting to distinguish *Foulenfont* and *Muqqddin*, it is clear

31

that the State either misunderstands or misconstrues the facts before this Court. For example, as a distinguishing characteristic, the State contends that "there was no artificial plane that required breaking to enter, rather Defendant entered the portal when he climbed over the *portal gate*" (emphasis added). The State further characterizes the portal as an "enclosed secluded portal with a locked gate." However, while the backyard was gated-in, it is clear upon review of the evidence that the portal itself does not include a gate, nor was it enclosed under our case law. Rather, photographic evidence establishes that the portal was completely open on two sides. The district court recognized as much, stating that the portal did "not have a set physical barrier," and that it was "not completely confined." Therefore, the State's conclusion that the portal was enclosed or that Defendant committed burglary when he jumped into the backyard is inconsistent with the facts and our case law.

{39}    Finally, the State quotes *State v. Lara*, 1978-NMCA-112, ¶ 5, 92 N.M. 274, 587 P.2d 52, to support that the portal "was burglarized by Defendant because it 'was part of the structure used as living quarters.'" *Lara* is of limited value here because it addressed whether a garage was part of the house when it was attached to and shared an interior wall with the house but "there was no direct access to the interior of the house." *Id.* ¶ 6. Therefore, the *Lara* Court addressed whether the lack of a direct entry into the home meant that the garage failed to qualify as a structure,

32

*not* whether the garage was sufficiently enclosed to constitute a prohibited space under the burglary statute. Indeed, there is no dispute here that the portal contained two doors leading directly into the house. Accordingly, *Lara* provides little guidance as the question here—whether the portal was sufficiently enclosed—was not present in *Lara*.

{40} Unpersuaded by the State's arguments, we conclude that the portal is not a structure. Accordingly, we must vacate Defendant's aggravated burglary and felony murder convictions.

**6. Retrial is permitted on felony murder and any legally adequate predicate felony**

{41} In light of our conclusion that Defendant's convictions for aggravated burglary and felony murder must be vacated, we must consider whether double jeopardy bars retrial. "Double jeopardy law governs the circumstances under which the state can prosecute a defendant a second time." *Revels*, 2025-NMSC-021, ¶ 19. When a defendant is acquitted, retrial is barred. *Id.* ¶¶ 19, 23. "An acquittal occurs on appeal when an appellate court reverses for insufficient evidence, because that is tantamount to a finding that the [s]tate's evidence failed to establish beyond a reasonable doubt the factual elements of the offense charged." *Id.* ¶ 20. As the State acknowledged in its briefing before the Court, however, Defendant does not contest any of the evidence presented to support the offenses.

{42} Instead, Defendant's sole argument is that the portal is not a structure under the aggravated burglary statute as a matter of law. "Appellate reversal on any grounds other than evidentiary insufficiency is considered reversal for trial error," which does not bar a retrial because "it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective." *Id.* ¶ 21 (internal quotation marks and citation omitted). Under such a circumstance, "the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." *Id.* (internal quotation marks and citation omitted). Indeed, Defendant conceded at oral argument that remand for a new trial is a viable remedy and requested such relief in his briefing before this Court. Because we vacate Defendant's convictions for aggravated burglary and felony murder on the basis of trial error, the direct-remand rule[5] does not apply, and "the State may elect to reprosecute him on th[ose] charge[s] if the State determines it can proceed on the basis of a legally adequate predicate felony."

---

[5]Defendant asserts that "this Court has authority to remand for an entry of judgment on [a] lesser included offense," thus invoking the direct-remand rule. But, as we clarified in *Revels*, the direct-remand rule only allows an appellate court to "'order resentencing on an adequately proven lesser included offense'" when it reverses on the basis of insufficient evidence, not trial error. ¶¶ 42, 48 (citation omitted).

34

*Id.* ¶ 48; *accord id.* ¶ 38 (concluding that reversal for trial error permits "retrial on the same or lesser charge").

**B.      Defendant's Jury Instruction Argument Is Moot**

{43}    Next, Defendant contends that the district court committed reversible error when it inserted the word "portal" into the jury instruction for aggravated burglary. The substance of Defendant's argument is the same as what he presented under the first issue—that a portal is not a structure under the aggravated burglary statute. For example, Defendant argues that "the district court's addition of 'portal' to the burglary instruction resulted in impermissibly broadening the reach of the burglary statute beyond what the [L]egislature intended." He similarly argues that the district court "amended the UJI in a way contrary to this Court's emphasis on enclosure in its analysis of burglary in *Muqqddin*." Given our conclusion that the portal in this case is not a structure under the aggravated burglary statute, the issue is rendered moot; thus, we need not address it further. *City of Las Cruces v. El Paso Elec. Co.*, 1998-NMSC-006, ¶ 18, 124 N.M. 640, 954 P.2d 72 (explaining that, as a general matter, we do not decide moot issues and we will not render advisory opinions).

**C.      Evidentiary Error**

{44}    Finally, Defendant alleges that the district court erred under Rule 11-403 NMRA and 11-404(B)(2) NMRA in admitting the guns unrelated to the shooting as

well as evidence of boxes of ammunition, accessories, and other items unconnected to the murder weapon or the shooting. Even though we vacate Defendant's convictions on other grounds, we "address this issue to provide guidance" in the event "the issue arises on remand." *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 37, 136 N.M. 309, 98 P.3d 699; *accord State v. Samora*, 2016-NMSC-031, ¶ 36, 387 P.3d 230.

**1.     Preservation and standard of review**

{45}     Defendant preserved the alleged error through (1) filing a motion in limine and (2) objecting to the State's proffered evidence under Rule 11-404(B). Defendant objected to the introduction of the unrelated firearms and other ammunition because the evidence only connected the murder weapon to the crime—thus, the other items "are not relevant to the current incident and would be highly prejudicial to [D]efendant." Defendant made largely the same argument at a pretrial hearing on the motion, reiterating that the evidence was unrelated propensity evidence that should not be admitted. The standard of review for a preserved challenge to the admission of evidence under Rules 11-403 and 11-404(B) is an abuse of discretion. *See State v. Romero*, 2019-NMSC-007, ¶ 26, 435 P.3d 1231. The district court's decision to admit or exclude evidence is generally "within the sound discretion of the trial court, and its determination will not be disturbed on appeal in the absence

of an abuse of discretion." *Id.* "In testing the balance between the relevant probative value and prejudicial effect of evidence under Rule 11-403, an abuse of discretion results when the trial court's decision is contrary to logic and reason." *Id.* (text only) (citation omitted).

**2.      The district court's ruling and trial**

{46}      The district court ruled:

> With respect to relevance, the court finds that the [murder weapon] that was recovered . . . is relevant. The court finds that the circumstances under which it was found is also relevant and material, that it was located in an inner bag, which was within an outer bag, and that there was ammunition. . . . The court finds also relevant the existence of a second barrel for the .9 millimeter [gun] as well as a second barrel for the .357 [murder weapon]. It looks like the .380 [gun], other than that it was found there [at the apartment] is . . . nothing to indicate that it had been modified, as the argument I understand the State's argument that the .357 [murder weapon] was [modified], and that the capacity to also modify the .9 millimeter as he also had those components, so other than mention that it was found with the two other firearms, I don't think there is anything else relevant about that firearm, but . . . the court will allow the testimony as to the circumstance under which the search warrant was executed, and the firearms were located, how they were packaged . . . but the court over objection would allow the 404(B) evidence with respect to those objects.

By contrast, the district court excluded evidence of any flashlights recovered from the search, concluding that it was "propensity-type evidence." It excluded portable tool kits, reasoning that there was no evidence that any tool was used to gain entry. It excluded gloves because "there is nothing that ties it to the crime." Finally, it

excluded a notebook that contained a handwritten list of addresses (that did not include Victim's address) because "it takes a leap, which is based on innuendo or propensity as to what the other addresses meant."

{47}  At trial, the State admitted physical evidence in addition to many dozens of photos of the other guns and accessories, as well as hours of witness testimony discussing the evidence—evidence that it never connected to the crime.

**3.     The State's argument on appeal**

{48}  Before this Court, the State's response to Defendant's claim of error focuses largely upon Rule 11-404(B)—the same rule on which the State at the district court appeared to concede. At the pretrial hearing on the State's notice of intent to introduce 11-404(B) evidence, the State "concede[d] [the guns other than the murder weapon] are not appropriate for purposes of 404(B)." On appeal, by contrast, the State argues that "[t]he weapons and accessories showed Defendant's access to, possession of, and knowledge of the Glock .357 murder weapon, its specialized ammunition, the other weapons and their accessories." The State's argument is circular, seeming to suggest that the other two guns and accessories somehow showed access to, possession of, and knowledge of the murder weapon itself. The State does not persuasively explain how possession of one gun shows possession or knowledge of another, unrelated gun. The State outlines the required elements of the

aggravated burglary and felony murder instructions, but again does not explain how the evidence goes to prove any of the elements of those crimes. Nevertheless, we need not affirmatively address the State's Rule 404(B) arguments in light of our conclusion that the evidence is irrelevant, which we explain below. But even if the evidence were relevant, we further conclude that the probative value of the evidence is substantially outweighed by the danger of unfairly prejudicing Defendant.

**4.      Admission of the other guns and accessories was error**

**a.      Relevance**

{49}      Evidence is only admissible if it is relevant. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence, and . . . the fact is of consequence in determining the action." Rule 11-401 NMRA. In its brief, the State contends that "there is no question as to" the relevance of the evidence if "the prior act evidence goes directly to prove an element of the crime" under Rule 11-402 NMRA and that "the evidence proffered by the State was probative on . . . essential elements of the charged crime" (omission in original) (internal quotation marks and citation omitted). But the State fails to identify a prior act or provide any analysis as to what element of a crime the evidence supports, so we cannot discern how the State believes the other weapons and accessories are

relevant. And without any evidence tying the other guns or accessories to the crime, it does not make any consequential fact more or less probable under Rule 11-401.

{50} On this point Defendant cites two out-of-state cases. Defendant first relies on a provision from *Agatheas v. State*, 77 So.3d 1232, 1236 (Fla. 2011), in asserting that "in order for evidence of a firearm to be admissible as relevant in a criminal trial, the State must show a sufficient link between the weapon and the crime" (text only) (citation omitted). *Agatheas* goes on to explain that the general rule applied by appellate courts in Florida "is that if there was no evidence linking any of these firearms to the charged crime, evidence of the firearms would be *irrelevant*, and should have been excluded upon proper objection." *Id.* (internal quotation marks and citation omitted). Defendant also relies upon *Alanis v. State*, 891 S.W.2d 737, 741 (Tex. App. 1994), which similarly provides that "possession of a firearm is admissible only if necessary to understand the facts and circumstances of the present offense of murder." Defendant relies upon these cases to conclude that "[t]he other guns and accessories had no relationship to the offense other than" for purposes of propensity.

{51} We agree with the reasoning provided in these out-of-state cases. Put simply, the two guns and accompanying ammunition introduced in this case—in contrast with the murder weapon and accessories connected to it—are not relevant because

40

they do not make any consequential fact more or less probable under Rule 11-401. There is no evidence that Defendant had more than one firearm on the date of the shooting. Victim was shot a single time, and there was only one casing recovered from the scene. That casing matched the Glock .357 murder weapon—not the .9 millimeter or the .380. Further, there is no evidence whatsoever that the other two guns or accessories found in the backpack were in Defendant's possession on the night in question. The State cites no evidence that Defendant was carrying a backpack or tactical bag, which is where the majority of the items were located in the apartment. The State fails to refer the Court to any evidence on appeal establishing that Defendant even *owned* any of the other guns or accessories on the date of the crime, rather than obtaining them sometime in the two years between the shooting and the subsequent search of Defendant's apartment. We conclude that the evidence is irrelevant.

**b.    Probative value**

{52}    But even if the State were to establish on remand that the evidence were relevant and otherwise admissible, it may nevertheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Rule 11-403. Thus, "[i]f the evidence is probative of something other than propensity," a court still "balance[s] the prejudicial effect of the evidence against its probative value."

*State v. Lovett*, 2012-NMSC-036, ¶ 32, 286 P.3d 265 (internal quotation marks and citation omitted). Despite acknowledging that Rule 11-403 is pertinent to our admissibility framework, the State on appeal engages in no discernable analysis to assist the Court in determining whether the probative value of the gun evidence was substantially outweighed by its prejudicial effect to Defendant. Defendant takes a similar approach, first noting that he objected at trial under Rule 11-403 and proceeding to briefly argue before this Court that (1) the gun evidence is irrelevant as well as more prejudicial than probative and (2) the evidence was inadmissible propensity evidence under Rule 11-404. Nevertheless, we have no trouble concluding under our precedent that any limited probative value of introducing two unrelated guns and a plethora of unrelated accessories is substantially outweighed by the danger of unfairly prejudicing Defendant. In *Casaus v. State*, for example, this Court concluded that the prejudicial impact of admitting a gun into evidence, where the record suggested that the gun was *not* the one used in the crimes charged, outweighed its probative value requiring reversal. *See* 1980-NMSC-017, ¶¶ 3, 8-9, 94 N.M. 58, 607 P.2d 596. *Casaus* is consistent with this Court's more recent Rule 11-403 precedent. *Compare, e.g.*, *State v. Chavez*, 2024-NMSC-023, ¶ 35, 562 P.3d 521 (concluding that the limited probative value of a single statement in a jail phone call made by defendant was "undoubtedly substantially more prejudicial than

probative" because the remainder of the statements in the call were pure propensity evidence), *with State v. Casillas*, S-1-SC-32911, dec. ¶¶ 17, 19, 45 (N.M. May 9, 2013) (nonprecedential) (concluding the district court did not err in allowing evidence of the defendant's prior possession of a gun because it was offered along with fingerprint evidence to establish that the gun itself was the murder weapon, in contrast with, as here, offering the weapon as mere propensity evidence).[6] Accordingly, the district court erred in admitting the irrelevant and highly prejudicial evidence of the other guns, ammunition, and accessories.

## III. CONCLUSION

{53}    For the foregoing reasons, we conclude the district court erred in determining that the portal is a prohibited space under the aggravated burglary statute. We, therefore, vacate Defendant's convictions for aggravated burglary and felony murder

---

[6]In light of our conclusion here (1) that the gun evidence was irrelevant, and (2) that, even if it were not, the probative value of the evidence is substantially outweighed by the danger of unfairly prejudicing Defendant, we need not address the State's assertion that the evidence qualifies as a crime, wrong, or other act under Rule 404(B)(2). And even if we were to assume that the evidence were relevant, the State on appeal has presented no evidence of a *prior* act, only presenting evidence obtained after the crime without tying it to any of Defendant's prior actions. This is insufficient. We are likewise unpersuaded by the State's remaining Rule 404 arguments.

on the basis of such trial error. The State, however, may elect to reprosecute Defendant on the same or lesser charges without violating double jeopardy.

{54}    **IT IS SO ORDERED.**

_____

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**BRIANA H. ZAMORA, Justice**

**DAVID K, THOMSON, Chief Justice, dissenting**

**THOMSON, Chief Justice (dissenting).**

{55} Our burglary law, first and foremost, requires us to respect an individual's expectation of privacy and to protect "against the feeling of violation and vulnerability that occurs when a burglar invades one's personal space." *State v. Off. of Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶¶ 42-43, 285 P.3d 622. Victim was roused shortly before two o'clock in the morning, lying on his couch in his living room, by a suspicious noise. He walked through his back door onto his portal, which was surrounded by his yard and enclosed by a wooden fence, to investigate. There he found Defendant, resulting in Victim's death and Defendant's conviction for felony murder that was based on Defendant's conviction for aggravated burglary. I respectfully dissent because the expectation of privacy and the security of the

inhabitant should govern this analysis—not the architecture of a space, which the majority relied upon to vacate this conviction.[7]

## I. DEVELOPMENT OF OUR BURGLARY JURISPRUDENCE

{56}     "Burglary consists of the unauthorized entry of any vehicle, watercraft, aircraft, dwelling or other structure." NMSA 1978, § 30-16-3 (1971); *see also* NMSA 1978, § 30-16-4 (1963) (defining aggravated burglary, the offense at issue in this case, identically in pertinent part). New Mexico courts have struggled to determine which structures can be burglarized. To contextualize the analysis that follows, I summarize several of those key cases.

---

[7]In an effort to discredit the dissent, the majority writes, "[T]he dissent suggests that a structure for purposes of the burglary and aggravated burglary statutes should be governed by an individual's subjective expectation of privacy rather than the physical nature of the space," extending statutory protection to "any space that an individual subjectively believes to be private." *See maj. op.* ¶ 34. That is incorrect. A careful and considered reading of the dissent makes clear that the inquiry should turn on whether a space invokes the privacy interest the Legislature intended to protect. The dissent endorses several tools to determine whether this privacy interest is invoked: the use of a space, both customarily and by the victim, *and* the space's architecture. The dissent does not suggest that any one of these considerations is dispositive. Moreover, in writing "none of the cases upon which the dissent relies support that an individual's subjective expectation of privacy governs the analysis," *maj. op.* ¶ 36, the majority ignores *State v. Shelby*, 2021-NMCA-064, 499 P.3d 671, which makes clear that an individual's actual use of a space is a valid consideration, *see* paragraphs 66 and 72, *infra*.

**A.**  **Pre-2012: Courts Viewed Burglary as a Crime Against Property and Developed an Architectural Tool to Reign in the Spaces That Could Be Burglarized**

{57}  At common law, burglary "was an offense against the security of habitation or occupancy." *Muqqddin*, 2012-NMSC-029, ¶ 16 (internal quotation marks and citation omitted). Our early burglary jurisprudence interpreted the expansion of spaces that could be burglarized beyond the "dwelling" as a shift in legislative intent from protecting the security of habitation to the security of property, identifying new spaces as structures that could be burglarized in the process. *See State v. Rodriguez*, 1984-NMCA-034, ¶¶ 4, 7, 101 N.M. 192, 679 P.2d 1290 (explaining that "[a]t common law, burglary was an offense against the security of habitation or occupancy" but "the statutory offense [was] one against the security of property which is entered" and holding that an uncovered pick-up truck bed was "a part of a vehicle" and thus could be burglarized (internal quotation marks and citations omitted)), *abrogated by Muqqddin*, 2012-NMSC-029, ¶¶ 38, 40; *State v. Gonzales*, 1967-NMSC-168, ¶¶ 5-6, 78 N.M. 218, 430 P.2d 376 (declining to apply ejusdem generis in interpreting "other structure" to permit the statute to apply to commercial structures, including the food store at issue (internal quotation marks and citation omitted)), *abrogated by Muqqddin*, 2012-NMSC-029, ¶¶ 30-31.

47

{58} In 1995, the Court of Appeals delineated the outer boundaries of this expanding list of spaces by deciding a fence was not a structure. *See State v. Foulenfont*, 1995-NMCA-028, ¶ 1, 119 N.M. 788, 895 P.2d 1329. The *Foulenfont* Court's architectural analysis was presented as a tool to help answer the primary question: whether the fence before the Court satisfied the perceived legislative intent behind the burglary statute at that time. *See id.* ¶ 7. In answering this question, the Court clarified the role of ejusdem generis in our burglary law—a structure must be "of the same kind or class as those specifically mentioned"—*architecturally* but not in *use. Id.* ¶¶ 9, 11. Thus, the appropriate inquiry was whether a space had "one or more walls and a roof" to be "capable of completely confining people and their property." *See id.* ¶ 11.

**B.  2012: This Court in *Muqqddin* Brought the Burglary Statute Back to Its Purpose of "Protecting Against the Feeling of Violation and Vulnerability When a Burglar Invades One's Personal Space," Relaxing the Architectural Tool Used to Aid This Inquiry**

{59} In *Muqqddin*, this Court held that a vehicle's gas tank and wheels were not structures that could be burglarized. 2012-NMSC-029, ¶¶ 5, 9, 12. In doing so, the Court "undert[ook] a review of our burglary jurisprudence" which had "expanded

48

significantly." *Id.* ¶ 1.[8]

{60} The *Muqqddin* Court made three points relevant to the analysis of the present case: (1) The core purpose of our burglary statute is "to protect against the feeling of violation and vulnerability that occurs when a burglar invades one's personal space," not to protect property, thus redefining the primary inquiry in evaluating whether a space is a structure, (2) architecturally, an individual has an expectation of privacy in a space if it has "some sort of enclosure"—but not necessarily more, and (3) burglarizing the vehicle-related spaces at issue would require crossing "an imaginary plane," a theory the Court declined to adopt. *Id.* ¶¶ 43-44, 46-47. I explain each of these points in turn.

{61} First, the *Muqqddin* Court explicitly departed from the purpose of the burglary statute as articulated in *Rodriguez*, 1984-NMCA-034, ¶ 6, and quoted with approval in *Foulenfont*, 1995-NMCA-028, ¶ 7: "'to protect possessory rights with respect to structures and conveyances, and to define prohibited space.'" *Muqqddin*, 2012-NMSC-029, ¶ 40 (quoting *Rodriguez*, 1984-NMCA-034, ¶ 6). The Court explained that the rights protected by burglary "go beyond the mere right to physical

---

[8]Pre-2012 burglary jurisprudence was consistent with the idea that structures with one or more walls and a roof could be burglarized, with the exception of vehicle-related cases such as *Rodriguez*, 1984-NMCA-034. *Muqqddin* specifically reevaluated this outlier in our burglary law.

possession of an object," with the primary focus being "the right to exclude" and the related "privacy interest." *Id.* ¶¶ 40-42. The Court wrote that "[i]t is the invasion of privacy and the victim's feeling of being personally violated that is the harm caused by the modern burglar," explaining that "[t]he privacy interest . . . protect[ed] is related to, though broader than, the security of habitation." *Id.* ¶¶ 42-43.[9] This privacy interest was not implicated by the facts before the Court. *Id.* ¶ 43.

{62}     Second, the *Muqqddin* Court cited *Foulenfont* to explain, architecturally, that prohibited space "must have some sort of enclosure" which "creates the expectation of privacy" and "puts the public on notice." *Id.* ¶¶ 44-45. Thus, the Court explained that "the proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusions." *Id.* ¶ 45 (internal quotation marks and citation omitted). Again, the facts before the Court did not meet this requirement. *See id.* ¶ 46.

---

[9]This is supported by the fact that our burglary statutes classify unauthorized entry into a "dwelling house" as a more serious crime than unauthorized entry into any other structure. *Compare* § 30-16-3(A) (burglary of a "dwelling house" is a third degree felony), *with* § 30-16-3(B) (burglary of any other structure is a fourth degree felony); *see also State v. Shelby*, 2021-NMCA-064, ¶ 8, 499 P.3d 671 ("The plain language and structure of the New Mexico burglary statute makes clear that the Legislature separated the unauthorized entry into a dwelling house from the unauthorized entry into all other structures as a more serious crime subject to greater punishment.").

{63} Third, the *Muqqddin* Court rejected "any penetration of a vehicle's perimeter [as] a penetration of the vehicle itself" because this "imaginary plane" does not put intruders on notice and is inherently ambiguous. 2012-NMSC-029, ¶¶ 46-47. The Court referenced a flat-bed pickup truck and the undulating surface of a vehicle as examples of the nonworkability of an imaginary plane. *Id.* ¶ 47. The only nonvehicle related example the Court gave to illustrate the faulty theory was enumerated as such: "Would the close of a house extend from the eaves to the foundation, such that stealing a shutter, obviously attached to the outside requiring no entry of the house itself, becomes a burglary?" *Id.* The Court clarified that this reasoning would not apply to "a window, [which] by its nature, creates an opening in an enclosure." *Id.* ¶ 48.

**C. Post-2012: The Court of Appeals and This Court Follow the *Muqqddin* Court's Guidance**

{64} Since 2012, the Court of Appeals and this Court have both defined structures that can be burglarized based on the redefined purpose of our burglary statutes from *Muqqddin*. These Courts' analyses make clear that the architectural inquiry helps a court decide if this privacy interest is implicated, rather than imposing strict structural requirements.

{65} In 2016, the Court of Appeals held that a private clerk's area in a public hotel lobby, secured by a locked back door, a chest-high counter, and a retractable barrier

51

that could be pulled down to enclose the space, was a structure that could be burglarized. *State v. Mestas*, 2016-NMCA-047, ¶¶ 2, 6, 27, 370 P.3d 805. The *Mestas* Court interpreted *Muqqddin* as distinguishing between the *conduct* that qualifies as burglary ("unauthorized entries") and the *structures* that can be burglarized: "[O]ur reading of the word 'vehicle' to include everything within the *exterior perimeter* of the vehicle as a whole (*including objects which could not be occupied by humans, such as the gas tank*) expanded the scope of the phrase 'unauthorized entry' beyond its common law conception." *Id.* ¶¶ 14, 16 (emphasis added). In short, the Court made clear that whether a space can be burglarized is inextricably linked to whether an entry would fit the common law understanding of "unauthorized," or implicate the privacy interest emphasized in *Muqqddin*. This inextricable connection is mirrored in the *Mestas* Court's analysis. The Court held that an "unauthorized entry" had been committed and that the clerk's area was a structure based on the same inquiry: whether it was "reasonable to expect some protection from unauthorized intrusions." *Id.* ¶ 22 (quoting *Muqqddin*, 2012-NMSC-029, ¶ 45, in holding that an "unauthorized entry" was committed) (internal quotation marks omitted); *see also id.* ¶ 25 (quoting the same language in reasoning that the clerk's area was a structure).

{66} In 2021, the Court of Appeals concluded that a house under construction was a "dwelling" under the burglary statute. *State v. Shelby*, 2021-NMCA-064, ¶ 1, 499 P.3d 671. The *Shelby* Court explicitly stated that the architectural inquiry is not alone dispositive: "The focus of our Supreme Court's analysis in *Muqqddin* was on the possessory and privacy interests the burglary statute seeks to protect, and the Court's discussion of both the physical characteristics of the structure and the use of a structure entered shows these are *interrelated considerations* when identifying the interest protected and the type of entry the Legislature seeks to deter." *Id.* ¶ 10 (emphasis added). Because of the *Muqqddin* Court's emphasis on the *use* of a structure and the definition of a "'dwelling house'" as "'any structure, any part of which is customarily *used* as living quarters,'" the *Shelby* Court undertook a lengthy analysis of the use of the house under construction, concluding that it qualified as a "dwelling." *Id.* ¶¶ 9-10, 12-23 (quoting UJI 14-1631 NMRA). Contrary to the majority's assertion that *Shelby* "is . . . of limited value here . . . [because] the defendant did not contest whether the home was a structure," *maj. op.* ¶ 23, the *Shelby* Court explicitly concluded the home was a structure, *Shelby*, 2021-NMCA-

53

064, ¶ 12. I note that a "dwelling" is a type of "structure." *See* UJI 14-1631; § 30-16-3, -4.[10]

{67} There have been no burglary cases before this Court since *Muqqddin*, but the Court considered unauthorized entry under the breaking and entering statute in 2016. *State v. Holt*, 2016-NMSC-011, 368 P.3d 409. The *Holt* Court reasoned that

---

[10]The majority writes, "*Shelby* cited *Mestas* to support its view that, 'under *Muqqddin*, we must examine the physical characteristics of an area to determine whether the space is private, enclosed, or *sealed-off* from public entry and protected by the burglary statute.'" *Maj. op.* ¶ 23 (quoting *Shelby*, 2021-NMCA-064, ¶ 8 (citation omitted)). The majority does not acknowledge that this phrase is disjunctive. "[T]he word 'or' should be given its normal disjunctive meaning unless the context . . . demands otherwise." *Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶ 9, 110 N.M. 314, 795 P.2d 1006. Thus, as the portal here is both private and enclosed, it need not be sealed-off.

The majority also writes, "While the dissent highlights the interior furnishing of the space, the *Shelby* Court concluded that 'the degree to which [the v]ictim moved his possessions into the house or the degree to which the interior of the house is finished are not necessarily the most significant considerations in this case because the house had a *fully finished and secure exterior* and it was actually used as living quarters.'" *Maj. op.* ¶ 23 (citing paragraph 72, *infra*) (quoting *Shelby*, 2021-NMCA-064, ¶ 16). This selective quotation of *Shelby* is undermined by the text directly preceding the quotation: "We believe the state of the interior of the house in the current case, though relevant, is of even less significance because it was *actually being used for habitation*. Giving more weight to the *actual use* of a house as living quarters than to the state of completeness of the interior and conventional comforts of a home more closely aligns with the purpose of the residential burglary statute:, that is, *to protect the security of the occupant and the possessory and privacy rights of habitation*." *Shelby*, 2021-NMCA-064, ¶ 16 (emphasis added). The majority's selective focus on a "secure exterior" avoids dealing with the *Shelby* Court's emphasis on both the victim's actual use of the space and the privacy interest the Legislature intends to protect via the burglary statutes.

54

breaking and entering is rooted in common law burglary and relied on burglary jurisprudence in reaching its conclusion. *Id.* ¶ 15.

{68}    The Court considered whether placing one's fingers behind a window screen constituted an unauthorized entry into a home. *Id.* ¶ 1. In doing so, the Court acknowledged that the entry and structure inquiries are inextricably linked. *See id.* ¶ 16 ("Thus, an 'entry,' for purposes of the breaking-and-entering statute, occurs whenever there is an invasion into an enclosed, private, prohibited space. But still we must ask how do we define the boundaries of these spaces." (citation omitted)); *contra maj. op.* ¶ 21 (stating that *Holt* "is . . . of limited value here . . . [because] the question at issue was whether there was an unauthorized entry, *not* whether the home was a structure"). The Court then stated that *Muqqddin* "embraced the following test: [T]he proper question is whether the nature of a structure's composition is such that *a reasonable person would expect some protection from unauthorized intrusions*." *Holt*, 2016-NMSC-011, ¶ 17 (emphasis added) (internal quotation marks and citation omitted). The Court held it was reasonable for New Mexicans to expect that window screens met this test. *Id.* ¶ 18.

{69}    With this background in mind, I turn to the analysis.

**II.    ANALYSIS**

**A.    The Portal Invokes the Privacy Interest the Legislature Intended to Protect**

{70}   The majority errs in vacating Defendant's conviction based on the application of an architectural tool without sufficient consideration of the central inquiry emphasized in *Muqqddin*: whether a space invokes the privacy interest the Legislature intended to protect. Victim had an expectation of privacy in his portal. Further, correct application of the architectural tools our courts have used to aid in defining prohibited space leads to the same result. The portal is a "dwelling" under our burglary statutes.

{71}   As clarified in *Muqqddin*, the key inquiry in defining prohibited space is whether a space invokes the right to exclude and the privacy interest the Legislature intended to protect. 2012-NMSC-029, ¶¶ 42, 43. Courts consider the use of a space to draw this conclusion. *Contra maj. op.* ¶ 30 (cautioning against "defin[ing] a statutorily prohibited space by a victim's furnishings or subjective testimony"); *see Shelby*, 2021-NMCA-064, ¶ 10 ("The focus of our Supreme Court's analysis in *Muqqddin* was on the possessory and privacy interests the burglary statute seeks to protect, and the Court's discussion of both the physical characteristics of the structure and the *use* of a structure entered shows these are *interrelated considerations* when identifying the interest protected and the type of entry the Legislature seeks to deter." (emphasis added)).

{72} Analyzing the use of a space can be very fact-intensive. The *Shelby* Court analyzed the use of a home under construction to conclude it qualified as a "dwelling," including discussion of the homeowner's "unconventional" and "temporary" furnishing of the space, his eating and sleeping habits, and his receipt of deliveries at the home. 2021-NMCA-064, ¶¶ 12-23. The majority makes the following example: "If we were to define a statutorily prohibited space by a victim's furnishings or subjective testimony with respect to the use of the space, as the district court did here, victims who spend most of their time outside but who cannot afford to purchase patio furniture may only receive the protection of trespass, whereas victims who have the means to furnish their patio but may not spend any time on the patio would receive the protection of the burglary statute." *Maj. op.* ¶ 30. I respectfully suggest that the majority's example is self-contradictory: the "subjective testimony" the majority mentions could make clear that a victim had an expectation of privacy in a "dwelling" space, no matter how it was furnished. My (and the Court of Appeals') reading of the law recognizes and prioritizes this "subjective testimony" as key to understanding when a victim has an expectation of privacy in a personal space, necessitating protection under our burglary statutes. The majority's approach would deny protection to an unhoused person, living the most intimate

57

parts of private life alongside their personal possessions in public, simply because the person could not afford four walls and a roof.

{73} A court considering the use of a portal generally could find it is a "dwelling" under our burglary statutes. An "adobe house in 1880 was essentially the same as it had been in 1780 and 1680. . . . The simplest early New Mexican house was one room deep[.] . . . An open porch, *portal*, provided communication between rooms." Agnesa Lufkin Reeve, *From Hacienda to Bungalow* 8 (1st ed. 1988); *see also* Eileen Vanessa Rojas, *Cultural Intersections and Historic Preservation: A Study of Las Vegas, New Mexico* 2 (1998), http://repository.upenn.edu/hp_theses/435, then follow "Files" hyperlink, *culturalintersec00roja.pdf* (13.18 MB) (last visited July 8, 2025) ("Frequently, the exterior *portal* or an enclosed courtyard served as the sole connection between interior spaces."). Portals are still very common in New Mexican residential architecture. They are a typical feature of building facades in Santa Fe's Downtown and Eastside Historic District and are proactively "encouraged" in the Westside-Guadalupe Historic District. Code of Ordinances City of Santa Fe, New Mexico, Article 14-5.2(E)(1)(a) (Downtown and Eastside Design Standards), (I)(1)(i) (Westside-Guadalupe Design Standards) (2025). Of note, existing portals in all Santa Fe Historic Districts "shall not be enclosed." Article 14-5.2(D)(4).

{74}    A court considering uses of Victim's portal specifically could conclude similarly. The portal at issue was furnished with seating, a table, a hutch, and a chandelier, undoubtedly signs of a "dwelling" space. Victim's wife testified the portal "was kind of a living area for us." The district court explained that "the testimony is that this was an extension of the living space of the home."

{75}    The majority disagrees, stating that "intrusion into a portal . . . does not invoke the same degree of violation or fear as that which occurs when a burglar invades the interior of one's home." *Maj. op.* ¶ 27. I cannot agree with this characterization.

**B.      Applying the Architectural Tool That Aids Courts in Defining Prohibited Space, as Articulated Both Before and After *Muqqddin*, the Portal Is a Structure**

{76}    Our Courts developed the architectural inquiry as a tool to effectuate the Legislature's intent, not to alone define prohibited space. *Contra maj. op.* ¶ 30 (explaining that under *Muqqddin*, the proper inquiry "objectively examines whether the structure is an enclosure capable of protecting from intrusion"); *see, e.g.*, *Foulenfont*, 1995-NMCA-028, ¶ 7 ("We must therefore examine Section 30-16-3 to see if a fence is the type of 'structure' that creates a prohibited space."). The majority misinterprets this architectural *tool* as articulated in *Foulenfont* and misconstrues it as a *test* that must be satisfied, without acknowledging that *Muqqddin* replaced that architectural inquiry with one that better serves burglary's purpose. However,

59

applying the tool as explained in both cases, the portal here is a structure. Importantly, *State v. Gonzales*, is still good law and supports that the portal here can be burglarized. 2008-NMCA-146, 145 N.M. 110, 194 P.3d 725.

**1.    The portal has two walls and a roof so is "capable of completely confining people and their property" under *Foulenfont***

{77}    The portal comports with the architectural tool as articulated in *Foulenfont*. The *Foulenfont* Court wrote:

> We therefore interpret the phrase "other structure" in Section 30-16-3 to require an enclosure similar to a vehicle, watercraft, aircraft, or dwelling. *See State v. Gamble*, 56 N.C.App. 55, 286 S.E.2d 804, 805 (1982) (definition of "building" which included the phrase "dwelling . . . *and any other structure designed to house or secure within it any activity or property*" historically required the structure to have one or more walls and a roof). Our interpretation is supported by the fact that, unlike a fence, all of the enumerated objects in the statute are capable of completely confining people and their property.

1995-NMCA-028, ¶ 11.

{78}    Thus, the fence before the Court was not an "other structure" because it did not have "one or more walls and a roof," so was not "capable of completely confining people and their property." This logically follows if one reads this paragraph sentence by sentence. Reading the first sentence in tandem with the parenthetical, the *Foulenfont* Court explains that an "other structure" that is "similar to a vehicle, watercraft, aircraft, or dwelling," in as much as it is designed to house or secure within it any activity or property, must have "one or more walls and a

roof." Reading the second sentence, the Court explains that a fence is distinguishable from the enumerated spaces because it is not "capable of completely confining people and their property."

{79} The majority, however, reads this paragraph to require a structure to be fully "enclosed" or "sealed-off", *maj. op.* ¶¶ 21-26, or in the present case, to require "a gate, screen, door, or other feature that would aid in fully enclosing the space," *maj. op.* ¶¶ 28, 32. This reading is not supported by the text of *Foulenfont*. The portal here has two walls and a roof. Thus, it is "capable of completely confining people and their property."

**2. The portal has "some sort of enclosure" so "is such that a reasonable person would expect some protection from unauthorized intrusions" under *Muqqddin***

{80} In addition to misconstruing *Foulenfont*, the majority does not acknowledge that its strict architectural analysis was replaced in *Muqqddin* by an inquiry which better serves burglary's purpose to protect the expectation of privacy. The *Muqqddin* Court wrote:

> Moreover, we agree with *Foulenfont* that in order for an area to be considered prohibited space under Section 30-16-3, it must have *some sort of enclosure*. Each of the enumerated structures in Section 30-16-3 either inherently has, or has been interpreted to require, some sort of enclosure. Accordingly, we believe it is this enclosed space that the Legislature intended to protect.

> Prohibited space is private space. It is the nature of the enclosure that creates the expectation of privacy. Enclosure puts the public on notice. As the California Court of Appeals stated, "[*T*]*he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusions.*"

2012-NMSC-029, ¶¶ 44-45 (emphasis added) (citation omitted).

{81} Thus, these paragraphs replace the idea that a structure must have "one or more walls and a roof," *see Foulenfont,* 1995-NMCA-028, ¶ 11, with an inquiry of whether a structure has "some sort of enclosure" that by nature of its composition causes "a reasonable person [to] expect some protection from unauthorized intrusions," *Muqqddin*, 2012-NMSC-029, ¶¶ 44-45 (internal quotation marks and citation omitted). This is borne out in the caselaw: post-2012 Courts have largely abandoned *Foulenfont*'s strict architectural analysis, instead relying on the inquiry established in *Muqqddin*. *See maj. op.* ¶ 15 (*Muqqddin* "provided a roadmap of principles to consider when examining whether a particular space is prohibited under New Mexico's burglary statute."); *Muqqddin*, 2012-NMSC-029, ¶ 44 (citing *Foulenfont* as having called for "some sort of enclosure"); *Shelby*, 2021-NMCA-064, ¶ 8 (citing "an enclosure" requirement, *Muqqddin*, 2012-NMSC-029, ¶¶ 42-44, without any citation to *Foulenfont*); *Holt*, 2016-NMSC-011, ¶ 17 (characterizing *Muqqddin*'s reinterpretation of *Foulenfont* articulated above as having "embraced [a] . . . test"); *Mestas*, 2016-NMCA-047, ¶ 24 (relying on "'completely confining

62

people and their property'" (quoting *Foulenfont*, 1995-NMCA-028, ¶ 11) only once).

{82} It is beyond question that a reasonable person would expect some protection from unauthorized intrusions in the portal at issue, which is open on two sides, attached to the back of a home, and surrounded by a yard enclosed by a wooden fence. Here, Victim's wife opened the door to the portal and saw Victim struggling with Defendant and soon after found Victim's body "slumped over a small retaining wall just beyond the portal." *See maj. op.* ¶ 5. The majority, however, disagrees, citing *Holt*, *Mestas*, and *Shelby*, which reasoned respectively that (1) a window screen, (2) a clerk's area in a hotel lobby secured by a locked back door, a chest-high counter, and a retractable barrier, and (3) an enclosed house met this standard. *See maj. op.* ¶¶ 21-25, 28. Importantly, neither the window screen, the retractable barrier, nor the enclosed house was *necessary* to meet the architectural inquiry articulated in *Foulenfont*, let alone under *Muqqddin*. *See Shelby*, 2012-NMCA-064, ¶ 12 ("Although not necessarily required of a 'dwelling house,' these characteristics supply ample evidence of an enclosure and the exercise of possessory and privacy rights that would put the public on notice of a private space."). Here, the portal's two walls and a roof are sufficient under our caselaw.

**3.   *Muqqddin* did not overrule *Gonzales*, which is architecturally analogous to the portal here**

{83}   *Gonzales* is sufficiently analogous to the case before us to support that the portal here is a structure. 2008-NMCA-146. The *Gonzales* Court held that a covered storage area open on three sides, attached to the side of a hardware store, accessible from a door that connected the two spaces, and surrounded by a yard enclosed by a chain link fence topped with barbed wire was a structure under the statute. *Id.* ¶ 8. Here, the portal is a covered area open on two sides, attached to the back of a home and accessible from two doors that connect the portal to the home, and surrounded by a yard enclosed by a wooden fence.

{84}   However, the majority concludes "that—even though the *Muqqddin* Court did not explicitly overrule *Gonzales*—it has little, if any, remaining precedential value" because (1) *Gonzales* relied on burglary jurisprudence from another jurisdiction that has a statute that differs from ours and (2) *Gonzales* relied on *Rodriguez*, which

64

*Muqqddin* clarified is no longer good law. *See maj. op.* ¶¶ 18-19.[11] I disagree, but also question why we would overrule *Gonzales* if the *Muqqddin* Court declined to do so.

{85}   First, *Muqqddin* did caution courts against relying on out-of-jurisdiction burglary jurisprudence based on a statute different than New Mexico's but did not do so in a way that undermined the *Gonzales* Court's holding. Here is the entirety of the portion of *Muqqddin* citing *Gonzales*:

> This is not to say that burglary jurisprudence and statutes from other jurisdictions are never relevant or helpful when interpreting our own. However, when relying on such authority we must ensure that another court is not relying on language that is absent from our statute or that the language of the statute differs so greatly from ours that it serves a different purpose. *But see Gonzales*, 2008-NMCA-146, 145 N.M. 110, 194 P.3d 725 (relying on *Garrett v. State*, 259 Ga. App. 870, 578 S.E.2d 460 (2002), to conclude that an open-air porch attached to a commercial structure can be burglarized in New Mexico, while the *Garrett* court relied specifically on language in the Georgia statute

---

[11]The majority also states that "[u]ltimately, the *Muqqddin* Court identified *Gonzales* as one of the cases in which the Court of Appeals significantly expanded the reach of the burglary statute without legislative authorization, which, in turn, supported this Court's conclusion that our precedent had 'gone astray' such that a course correction was necessary. *Id.* ¶¶ 1, 22." *Maj. op.* ¶ 19. This assertion rests on the assumption that the Court of Appeals opinions referenced generally in paragraph 1 of *Muqqddin* as those that have "gone astray" are identical to those cited in paragraph 22 as expanding the structures that could be burglarized, although paragraph 22 does not mention "legislative authorization." Further, this assertion is at odds with the majority opinion, which plainly admits that *Gonzales* was *not* explicitly disavowed in *Muqqddin*. *Maj. op.* ¶ 19.

65

indicating that a structure or *a part of a structure* can be burglarized, an addition that is absent from New Mexico's statute).

2012-NMSC-029, ¶ 28 (footnote omitted). The *Muqqddin* Court identified *Gonzales* as an example of an instance in which the Court strayed analytically *but still reached a sound result. See The Bluebook: A Uniform System of Citation* R. 1.2(c), at 63 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) (A *but see* signal "indicate[s] . . . [c]ited authority clearly supports a proposition contrary to the main proposition. *But see* is used where *see* would be used for support." (internal quotation marks omitted)).

{86}    Second, while *Muqqddin*, 2012-NMSC-029, ¶¶ 38, 40, held that *Rodriguez* is no longer good law, that does not invalidate *Gonzales*'s holding. *Gonzales* cites *Rodriguez* as follows:

> Accordingly, as the court did in *Garrett*, we conclude that the covered area is an example of the kind of "prohibited space" within a "structure" that the [L]egislature intended to protect when it enacted our burglary statute. *See Foulenfont*, [1995-NMCA-028, ¶ 7] (explaining that "the type of harm or evil the legislature intended to prevent" when it enacted our burglary statute was to prevent the intrusion of one into the "prohibited space" of another); *cf.* [*Rodriguez*, 1984-NMCA-034, ¶ 7] (holding that the bed of a pickup truck, because it was part of the vehicle, fell within the protection provided by our burglary statute).

2008-NMCA-146, ¶ 8. Thus, the *Gonzales* Court cited *Rodriguez* to support the idea that a "part" of a structure can be burglarized, not for its use of the imaginary plane theory, as the majority suggests. *Maj. op.* ¶ 19. The *Muqqddin* Court rejected

66

*Rodriguez* under the rationale that our burglary statutes do not explicitly include "parts" of enumerated structures. *Muqqddin*, 2012-NMSC-029, ¶¶ 37-38. However, there is no need to see the covered storage area in *Gonzales* as a "part" of a structure—it is itself a structure. And even if one did, the Court of Appeals has since made clear that the inverse is not true: *Muqqddin* does not exclude *any* space that could be construed as a "part" of a structure from qualifying as such under our burglary statutes. *Mestas*, 2016-NMCA-047, ¶ 24. This may explain why *Muqqddin* did not overrule *Gonzales*, but instead used it as an example of inappropriate reliance on an out-of-jurisdiction statute which differed from New Mexico's statute.

**4.    Holding the portal to be a structure, even though it is by its nature "open to the elements," does not necessitate adoption of the "imaginary plane" theory rejected by *Muqqddin***

{87}    Holding the portal a structure does not necessitate adopting the imaginary plane theory. *Contra maj. op.* ¶ 26 ("Defendant necessarily is being punished for crossing an [imaginary] plane."). The *Muqqddin* Court rejected the theory as allowing waving a hand over a flat-bed truck or stealing a shutter from the exterior of a home to constitute burglary, but stated that the theory did not apply to "a window, [which] by its nature, creates an opening in an enclosure." *Id.* ¶¶ 47-48. As these examples make clear, the Court rejected the theory because of a concern that it incorporated spaces *external* to a structure, not because it *imposed* an imaginary

67

plane on openings in a structure without a barrier. *See Mestas*, 2016-NMCA-047, ¶ 16 (interpreting *Muqqddin* to have criticized the Court of Appeals' "reading of the word 'vehicle' to include everything within the *exterior perimeter* of the vehicle as a whole" as "expand[ing] the scope of the phrase 'unauthorized entry' beyond its common law conception" (emphasis added)).

{88}    Entering the open side of a portal does not require breaking some sort of imaginary plane akin to stealing of a shutter on the exterior of a home. Instead, it is more like entering a window, which by its nature creates an opening in the portal's enclosure. The *Mestas* Court did not apply the imaginary plane theory to the facts before it, instead analogizing the open area above the counter of a clerk's area in a hotel lobby to an open window. *See* 2016-NMCA-047, ¶ 28; *see also id.* ¶ 26 (explaining that the Court in *State v. Holt*, 2015-NMCA-073, 352 P.3d 702, reasoned that the imaginary plane theory did not apply in holding "that the space between a window screen and a closed window on a home was a protected space under *Muqqddin*"); *Holt*, 2016-NMSC-011, ¶ 18 (holding that an entry occurred without mention of the imaginary plane theory). The same logic applies here.

{89}    Thus, to determine whether Defendant entered the portal, we need not rely on the concept of an imaginary plane, but on the judgment of the jury. While it seems that the district court struggled to describe the boundary of the portal, the jury found

68

that Defendant entered it. Further, Defendant abandoned appeal of this factual issue, instead focusing on the purely legal question of whether a portal is a structure.

{90}   In conclusion, the majority's overreliance on an architectural tool reverses the *Muqqddin* Court's work to bring burglary back to its purpose of "protect[ing] against the feeling of violation and vulnerability that occurs when a burglar invades one's personal space." 2012-NMSC-029, ¶ 43. I am unable to concur that Victim's portal in this case is not a structure, specifically a "dwelling," under our burglary statutes. Thus, I respectfully dissent.

_____

**THOMSON, Chief Justice**